# MADISON *v.* STATE

[No. 148, October Term, 1951.]

2

*Decided April 4, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*James S. Morrow, Jr.,* with whom was *Thomas J. Kenney* on the brief, for the appellant.

*Francis D. Murnaghan, Jr., Assistant Attorney General,* with whom were *Hall Hammond, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City, William H. Maynard, Deputy State's Attorney,* and *William C. Rogers, Jr., Assistant State's Attorney,* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from conviction of murder in the first degree and sentence of death.

On Saturday, April 28, 1951 about half-past eight in the morning, Zelig Gerstein, the proprietor of a small grocery store at 417 North Fremont Avenue, between Mulberry and Franklin Streets, was killed by a bullet fired, at close range, from a pistol in defendant's hand. The court, in its advisory charge to the jury, advised the jury that it could not find a verdict of murder in the first degree unless it found beyond a reasonable doubt that defendant attempted to rob Gerstein and in the attempt shot and killed him. Defendant denies that he attempted to rob Gerstein or intended to shoot or kill him.

Defendant was twenty-three years old. He lived at 876 West Fayette Street. He testified that he was going to the Atlantic Waste Paper Company, in east Baltimore, where he had worked the day before and had worked previously for about seven months. He went into the Gerstein store to get some "lunch meat", bologna. No one else than Mr. Gerstein was there. He told Mr. Gerstein he did not like the way the meat was cut and wrapped. After some words, in an "argument", Mr. Gerstein "said a few words that I didn't like", viz., "You niggers never are satisfied", told him to get out of the store, came from behind the counter to put him out, and a "tussle" began. Mr. Gerstein got him down, was on top of him. He bit Gerstein in the face. His "gun" fell out of his pocket. He was unaware it was in his pocket; he was cleaning it the day before and must have put it in one of the large pockets of the "fatigue pants" of khaki that he was wearing. After getting away from Gerstein, he grabbed the gun, Gerstein grabbed him by the right arm, twisted his arm, and the gun, which was in his right hand, went off and killed Gerstein quickly, but not instantly. Gerstein called for help after he was shot. Defendant had bought the gun about two weeks before, from a white man on the street, who was very anxious to get what he could for it at once. Defendant walked out to the corner, turned the corner and soon began to run. He was ar-

rested about half-past nine that night. He had no intention of robbery when he went in the store. He then had seven dollars in his pocket, which he had taken from a drawer at home out of forty-two dollars put there by Flora Smith, a woman he lived with. "I considered her money my money; we spent alike and shared alike." Other parts of his testimony seem to indicate he felt that what was hers was his and what was his was his own. He had been convicted of burglary twice and larceny once. He had first told the police a false story that he had been with a tall man, who had said he was "broke", had gone with him into the store, and grabbed his gun out of his pocket; when the tall man said it was a holdup, he ran and after the shooting saw the man at Lexington Street and was given back his gun. He had since childhood known Gerstein and at times had helped him in his store. He mentioned no previous trouble or ill will between him and Gerstein.

The State called two witnesses, Johnnie Winder and Annie Woods, whose testimony was not intrinsically or extrinsically impeached, who testified that they saw defendant and Gerstein fighting, heard the shot, heard Gerstein call for help and saw defendant come out of the store after the shooting. Winder said Gerstein called for help before he was shot, Annie Woods said after he was shot. Winder said he was walking past the Gerstein store about two minutes before the shooting, heard noise, looked in the open door and saw Gerstein and defendant tussling. Annie Woods came to go in the store, Winder told her not to do so because the men were fighting. Neither saw anyone else in the store or coming out. Before the shooting Winder and Annie Woods walked a short distance from the store. After the shooting she says she went to a nearby store to have the police called. Winder says she went and returned before the shooting.

The State also called Dolores Wooden, twenty-one years old, who had been held in jail as a witness since soon after the shooting. She testified that she was in

the store when defendant came in and at the time of the shooting and heard defendant tell Gerstein it was a hold-up. Her testimony is both intrinsically and extrinsically impeached, by lack of a good reputation, the fact that she first gave the police a different untrue story about two men, a "tall man" and a short one, the fact that she hoped to get out of jail by what she said, and the fact that Winder and Annie Woods, as well as defendant, testified that they did not see her in the store or coming out. Defendant testified that he had heard of the first story Dolores Wooden had told, and he had made up his first story accordingly. He even "identified" a "tall man", who was held in jail until the trial. Dolores Wooden and other witnesses were examined and cross-examined at length, without objection, concerning her, her stories and how, why and when she was "picked up" and held as a witness. Counsel for defendant even questioned a police captain about a newspaper report of what she had said. Obviously much of this testimony was not legally admissible, but there was no objection, and defendant at least was not prejudiced by it.

A number of other witnesses testified. We have not undertaken to state in full the testimony of any witness. What has been said may suffice to illustrate that the questions at issue were questions of fact, which in respect of credibility are practically reducible to the question how much of defendant's testimony could be believed. These questions were for the jury, and are not reviewable by us. No question was raised—or could be raised—as to the legal sufficiency of evidence of guilt.

The only question properly presented, by objection below, is the admissibility of a photograph of the deceased's body showing the bullet hole and marks on the face, including a bite on the cheek. A description of the body in the autopsy report had been offered in evidence without objection. Defense counsel objected to the admission of the photograph because (1) "it might be inflammatory" and (2) "we ought to wait until there is some evidence to connect it in the case". Defense

counsel disclaimed any contention that the photograph did not represent the condition of the body at the time the photograph was taken, and any requirement of testimony from the autopsy physician or any formal proof by the photographer. In the admission of the photograph there was no reversible error. The photograph was admissible. *Snowden v. State,* 133 Md. 624, 631, 106 A. 5; *Smith v. State,* 182 Md. 176, 187-188, 32 A. 2d 863; *Corens v. State,* 185 Md. 561, 570-571, 45 A. 2d 340; *Consolidated Gas Co. v. State, to use of Smith,* 109 Md. 186, 199-200, 72 A. 651. If the autopsy report had not sufficiently "connected" the photograph with the case, any defect in this respect was subsequently cured by defendant's testimony that he bit the deceased and a bullet from his gun killed the deceased.

Defendant contends that by the ruling admitting the photograph in evidence and by other action or non-action which involves no ruling at all by the trial court, "serious error may have been committed" and should be corrected without regard to the rules of law ordinarily governing appeals. The contention is that defendant's conviction of a capital offense depended on the testimony of one witness, Dolores Wooden, and that "upon the single material issue of fact thus joined, * * * any side issues, any incidents during the trial which might have prejudiced the jury against defendant, took on an importance and significance of unusual proportions not common to ordinary criminal cases, nor even to the usual homicide case". We are told that failure to raise below questions now raised was due to fear of prejudicing defendant before the jury by objections, especially objections which suggest guilt, *e. g.,* the right of the jury to find a verdict without capital punishment. We are aware that some lawyers include such "taboos" in their "trial tactics"— and others, who have attained reputation as trial lawyers, make any objections they deem substantial and press them to the end. We are, however, without authority to review errors in trial tactics of defense counsel or to

speculate as to possibilities that different tactics might have produced a different result.

The only statute or rule of court which makes special provision for review of capital cases is Chapter 1068 of the Acts of 1945, Code, 1947 Supp., Art. 5, section 88A, which authorizes appeals *in forma pauperis* and provides that "the Court of Appeals shall review any reviewable errors therein [in the record], without regard to technical errors, defects or exceptions which do not affect the substantial rights of the parties". We have held that "reviewable errors", in this statute, does not include questions not previously reviewable. "We are given authority only to review 'any reviewable errors'. No errors are newly made reviewable, nor is the long continued construction of a section of the Constitution a 'technical errors, defects or exceptions' which we are supposed to disregard. What the Legislature meant was, undoubtedly, that this Court in cases where a sentence of death has been imposed, shall disregard the method by which substantive questions are brought before us, and shall determine such questions, regardless of whether all the procedural rules have been obeyed or not." *Peters and Demby v. State*, 187 Md. 7, 16-18, 48 A. 2d 586, 591. The statute even seems to restrict the scope of "reviewable errors" to the extent that it directs us to disregard "technical errors * * * which do not affect the substantial rights of the parties".

Rule 9 of this court, "In no case shall the Court of Appeals decide any point or question which does not plainly appear by the record to have been tried and decided by the Court below.", originated in Chapter 117 of the Acts of 1825. Code of 1939, Art. 5, sec. 10. Until 1872 there was no right of appeal in criminal cases. *State v. Adams*, 196 Md. 341, 346, 76 A. 2d 575, 576-577. But Rule 9 applies to criminal as well as civil cases. *Davis v. State*, 189 Md. 269, 273, 55 A. 2d 702; *Swann v. State*, 192 Md. 9, 63 A. 2d 324.

Rule 6(g) of the Criminal Rules of Practice and Procedure provides, "Upon appeal a party, in assigning error

in the instructions, shall be restricted to" (1) the particular portion of the instructions given or the particular omission or failure to instruct distinctly objected to before the jury retired and (2) the specific grounds of objection then stated. "No other errors or assignments of errors in the instructions shall be considered by the Court of Appeals, but the Court of Appeals of its own motion may take cognizance of and correct any plain error material to the rights of the accused even though not included in the assignment of errors." Whatever "plain error material to the rights of the accused" may include, it does not include bad guesses by counsel whether or not to object to anything done or left undone by the court.

We may say that we need not accept defendant's premise that the charge of murder in the first degree depended solely upon the testimony of Dolores Wooden. No advisory instruction to this effect was given or requested. We cannot pass upon a nonexistent instruction or request. We do not, however, accept defendant's contention that when an unarmed storekeeper is seen "tussling" in his store with another man, with no one else present, and a short time later is shot and killed (intentionally or unintentionally) by the other man, a jury is bound to accept defendant's version of the visit to the store and the shooting and cannot infer that the purpose and attempt of the armed man was robbery. A man with racial prejudice against negroes does not ordinarily conduct a store in a negro neighborhood; if he does, he ordinarily tries to attract customers into the store, not to throw them out; in any event, he does not ordinarily, when alone and unarmed, vent his feelings against "niggers" upon a young negro, whom he has known for years, with whom he has had no trouble, and who, at least possibly, may be armed.

The court, in its advisory charge, after saying, "There are four possibilities so far as the crime itself is concerned, although there are five possible verdicts you can reach", and accurately stating the five verdicts, in-

cluding "guilty of murder in the first degree without capital punishment", then explained the four possibilities, as far as the crime itself is concerned, *viz.*, murder in the first degree, murder in the second degree, manslaughter, and not guilty. Defendant now says that failure to mention again a verdict of guilty of murder in the first degree without capital punishment may have misled the jury and that counsel did not mention the point for fear of prejudicing the jury by suggesting defendant's guilt. In both respects defendant assumes limitless stupidity on the part of the jury. If defendant wanted mention of a verdict of guilty without capital punishment repeated, he had only to ask and the court would doubtless have repeated it. If the jury might have been prejudiced by such a request, they might have been similarly prejudiced by repetition without request. In this matter there was no error, no ruling, and we see no indication of prejudice.

After defendant had been examined and cross-examined at length Judge Warnken (one of the three judges who sat in the case) asked him (without objection) a number of questions about the nearest street car route from his home on West Fayette Street to the place of business of the Atlantic Waste Paper Company (said to be at 4600 E. Fayette Street) and why he went as far north as the Gerstein store to buy "lunch meat" instead of getting it nearer home and taking a Fayette Street car and (if necessary) transferring east. Defendant said he rode on the No. 27 line, transferred "on Dolphin Street, I believe", "I believe that is the No. 27 line", "the easiest way for me to go there was to catch a street car and transfer to Monument Street"—"I never rode street cars too much—Preston Street to Pennsylvania Avenue. It was to Dolphin Street." "(Judge Moser) He wasn't living on Fayette Street at the time he worked there." "(Mr. Kenney) How long ago did you work at this place? (Witness) About two years ago. (Mr. Kenney) I have no objection to the court pursuing the inquiry, but I do suggest very respectfully

that the way the court is asking the question is not quite fair. You are asking him in a manner that seems to assume as a fact that there is direct transportation from Fayette Street out there. I don't know that it is a fact. I don't believe the court knows it. I believe the jury is getting the impression that—(Judge Warnken) I don't want to be unfair to the witness. I won't ask him any more questions. (Mr. Kenney) Your Honor, I know you don't intend to be unfair. (Judge Warnken) I would not for a moment do anything that would make you think I appeared to be unfair. I won't ask him any more questions about that. (Judge Moser) When your man was working at that place, he wasn't living on Fayette Street. Therefore, he would not have knowledge about the Fayette Street transportation." The State's attorney then asked a few questions on this line without objection. If previous questions were objectionable, objection could have been made early as well as late. The line of questions was obviously relevant, and it brought out defendant's explanation, which was not obvious but was clearly summed up in Judge Moser's remarks. In this court defendant says, "The clear effect of the examination and the position which the examining judge took in the matter, was to impress the jury with the proposition that the judge seriously doubted the credibility of the defendant's testimony on this point." Judge Warnken's questions were not unfair and were not prejudicial in the respect now contended. A judge's right to ask questions is not confined to questions which have no possible bearing on credibility. As we have said, in the instant case practically all relevant questions involve defendant's credibility. The case could not possibly have gone so far without impressing upon the jury that there was at least "serious doubt as to the credibility of defendant's testimony". Again there was no error, no ruling, no prejudice.

Near the close of the case defendant called Flora Smith, the woman with whom he lived, to testify that he had a "right" to take, without asking, seven dollars

out of her money on the morning of the killing. On cross-examination she was asked, "Q. Right after this thing happened, Lieutenant Amrhein questioned you at the Western? A. Yes, sir. Q. You told him that Madison had told you he was going out and rob a place, didn't you? (Mr. Kenney) Objected to. It is outside the scope of the direct examination." The State then made her its witness. "Q. You talked to Lieutenant Amrhein shortly after this shooting, this gentlemen (indicating)? A. Shortly after the shooting. I talked to him that Saturday night. Q. What did you tell him about Madison going out to do anything? A. Madison was drinking. He told me he was going to hold up a place. (Mr. Kenney) When was this? (The Witness) This was Saturday evening about three-thirty. * * * Q. When did you talk to Madison when he was drinking? A. When he was laying on the bed. I was listening out the window. One woman was telling another woman about her hearing about some killing on Fremont Avenue. I was telling Sylvester about it. I said: 'Did you hear about that?' He said: 'What?' I said: 'Somebody was killed on Fremont Avenue.' That is when he told me that. Q. This was Saturday afternoon after the shooting? A. It was about three-thirty in the evening. Q. In the afternoon? A. Yes, sir. Q. He told you he was going to rob a place? A. Yes. Q. Or, that he had robbed a place? A. He did not tell me he had robbed no place. Q. He told you he was going to rob a place? A. I think he said 'I am going to hold up a place'." "* * * if, as claimed by the State, a murder has been committed, the movements and declarations made by the traverser between the time of the commission of the crime and the time of his arrest could hardly be other than important as reflecting upon his culpability *vel non* * * *." *McCleary v. State,* 122 Md. 394, 398, 89 A. 1100, quoted and followed in *Smith v. State,* 182 Md. 176, 184, 32 A. 2d 863. We need not undertake to say whether the remark in question was important or how far, if at all, or how, it reflected a guilty conscience or mere

alcohol. We need not even decide whether it was admissible. It was admitted without objection. Later defendant testified that he had not made the remark. There was no error and no ruling. Defendant had a fair trial, and there is no reversible error.

*Judgment affirmed.*