570 A.2d 887

**Mervil Leon PRICE, Jr.**

v.

**STATE of Maryland.**

**No. 1022, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

March 6, 1990.

Certiorari Denied June 29, 1990.

Michael R. Malloy, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Ann N. Bosse, Asst. Atty. Gen., Baltimore, and Kenneth M. Long, Jr., State's Atty. for Washington County, Hagerstown, on the brief), for appellee.

Argued before WILNER, BISHOP and BLOOM, JJ.

BISHOP, Judge.

Mervil Leon Price, Jr., appellant, was charged by criminal information with two counts of murder and two counts of assault with the intent to murder. Appellant entered pleas

of not guilty and not criminally responsible and was tried by a jury on February 14, 15 and 16, 1989 in the Circuit Court for Washington County (Judge F.C. Wright, III). On February 15, 1989 the court granted the State's motion to bifurcate the case on the issues of guilt and criminal responsibility. On February 16, 1989 the jury found appellant guilty of two counts of second degree murder.

After a hearing before the jury on February 23 and 24, 1989 the jury found appellant criminally responsible.

Appellant was sentenced to two consecutive thirty (30) year terms of imprisonment.

## ISSUES

Appellant asks:

I. Whether the trial court erred by instructing the jury that they could not consider a verdict of manslaughter on the homicide of Sherri Unger;

II. Whether the trial court erroneously overruled appellant's objection to bifurcation of the guilt and criminal responsibility phases of the trial;

III. Whether the admission of photographs of the homicide victims was an abuse of the trial court's discretion; and

IV. Whether the trial court abused its discretion by ordering appellant to hold the rifle identified as the murder weapon.

## FACTS

It was undisputed that appellant shot both his wife, Betty Jean Price (B.J.), and his fifteen (15) year old stepdaughter, Sherri Unger (Sherri), each in the head with a .22 caliber rifle.

The State's first witness, Dr. Julia Goodin of the Medical Examiner's office, testified that the victims died from gunshot wounds to the head and that B.J. had a blood alcohol content of .14 at the time of her death.

Next the State called James Hahn, the son of B.J., who testified that on the evening of their deaths, his mother and sister called him asking to be picked up from their house because his mother and appellant were fighting. Hahn advised them to call a cab because he only had a motorcycle at that time. Hahn testified that he could tell that his mother had been drinking.

Appellant's son, Martin Price, was called as a State's witness and testified that on the night of July 28, 1988 appellant visited him and confessed to shooting B.J. and Sherri. Afterwards, Martin drove appellant to the nearest police station.

The State called six more witnesses and then the court adjourned for the day. On the second day of trial the State made a motion to bifurcate the proceedings. The court granted the motion and ordered a continuance of the issue of criminal responsibility. The State then called its last witness and rested its case.

Appellant's motion for acquittal was denied. Appellant then called Teresa Hibbard, his daughter, who testified that just prior to the shooting, she had spoken with B.J. and Sherri on the telephone. They wanted to leave appellant's house and Hibbard advised them to take a cab. Hibbard testified that she could tell something was going on and that she tried to calm Sherri and B.J. In addition, she testified that B.J. and Sherri refused to allow her to speak to appellant and that she could tell that B.J. had been drinking.

Appellant testified that B.J. had a "drinking" problem and that she became nasty when she drank; she occasionally ran off for a period of a few days.

Appellant then testified that he arrived home from work on July 28 at approximately 5:45 p.m. After he took a nap, he was confronted by a drunken B.J. who accused him of touching Sherri's breasts and other inappropriate conduct. Believing B.J. was preparing to leave him, appellant went upstairs where he heard her speaking on the telephone.

Appellant confronted Sherri and B.J. in Sherri's bedroom. B.J. responded by "cursing and hollering" and then she struck appellant with her hands and a telephone. Defending himself, appellant struck B.J. once in the face and broke her nose. Appellant testified that at this point, he began to enter a dream-like state. He said that at that point he was not mad. He could hear Sherri yelling at him in the background when he went to get the gun. While still in a dream-like state, appellant returned to the bedroom with a .22 caliber rifle. He testified that he remembered holding the gun but that he did not remember firing the fatal shots. At the time of the shooting appellant was still in the dream-like state and did not feel anger or fear for his life. When appellant realized what had happened he fled the scene, going first to his son's house. His son then took him to the police station where he first realized he had broken his arm.

Dr. Richard Epstein, a private psychiatrist, testified as an expert that appellant was in a disassociative state at the time of the shooting, and unable to comprehend what was going on about him. This disassociation was a symptom of the post-traumatic stress disorder suffered by appellant as a result of physical and emotional abuse he suffered as a child. The defense then rested its case.

Dr. Lawrence Raifman, a psychologist from Clifton T. Perkins State Hospital, as State's rebuttal witness, testified that appellant and his wife, B.J., had a chaotic relationship and that Sherri took advantage of that chaos to manipulate appellant and B.J. He opined that appellant did not suffer a reaction resulting from post-traumatic stress, and that at the time of the shooting, appellant had the capacity to form the requisite willful state of mind.

At the close of all the evidence the trial judge denied appellant's request to instruct the jury on manslaughter with regard to the charge involving Sherri. Appellant, however, was permitted to argue to the jury that Sherri was indeed the victim of manslaughter. The State, in closing, reminded the jury that the court determined there

was no legal basis to convict appellant for manslaughter in the death of Sherri. Appellant was subsequently convicted of two counts of second degree murder.

## DISCUSSION

### I. *Manslaughter Instruction*

■ Appellant argues that Maryland Rule 4–325(c) requires the court to instruct the jury on applicable law upon the request of any party. As long as some evidence is present all lesser included offenses of murder must be included in the instruction to the jury. Appellant posits that there was evidence that Sherri Unger provoked appellant and, therefore, a manslaughter instruction should have been given with reference to her death.

The State responds that the trial court properly refused to instruct the jury that Sherri's death may have been the result of manslaughter because there was no *prima facie* showing of hot-blooded provocation with reference to her.

The trial court found that while a jury might find appellant's shooting of his wife to be a hot-blooded reaction to a violent fight, "... obviously its not a reaction of any kind to anything Sherri did." Therefore, the trial court decided that a manslaughter instruction would be inapplicable to Sherri because "Sherri was not an instigator. And for manslaughter the victim has to be the instigator." The judge instructed the jury on manslaughter and added:

> The only act you can find to be adequate provocation under the evidence in this case is a battery by Betty Jean Price upon the defendant Mervil Price. Third, the defendant was still enraged when he killed. That is his actual rage had not been cooled by the time of the killings. Fourth, there was not enough time between the provocation and the killing for a reasonable person's rage to cool. And lastly, the victim was the person who provoked the rage.
>
> Now there's no evidence in this case that Sherri Lynn Unger provoked any rage. Therefore I'll instruct you

that there is not sufficient evidence legally to consider manslaughter as it applies to the killing and death of Sherri Lynn Unger. You may however consider manslaughter as an option in the killing of Betty Jean Price....

In *Hook v. State*, 315 Md. 25, 41, 553 A.2d 233 (1989) the Court held that in a murder case, "at the request of the defendant, the court shall instruct the jury regarding a lesser included offense when the evidence warrants such an instruction, that is, when the offense is fairly supported by the evidence." There must have been evidence adduced that would support the instruction of manslaughter. Appellant argued there was evidence of a hot-blooded provocation warranting the instruction. We held that:

"[T]here may be a homicide which would otherwise be murder which is reduced to manslaughter by circumstances of alleviation or mitigation. Such a case is where the circumstances surrounding the homicide establish that it was provoked. For the 'Rule of Provocation' to be invoked there are four requirements:

(1) There must have been adequate provocation;

(2) The killing must have been in the heat of passion;

(3) It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;

(4) There must have been a causal connection between the provocation, the passion, and the fatal act."

*Cunningham v. State*, 58 Md.App. 249, 258, 473 A.2d 40 (1984), quoting from *Whitehead v. State*, 9 Md.App. 7, 10–11, 262 A.2d 316 (1970). The evidence adduced in this case must be measured against these requirements.

■ As we stated in *Cunningham* "[t]he appellant failed to establish a *prima facie* case of hot-blooded provocation with respect to at least two of the necessary four elements." The first requisite is that there be adequate provocation. In *Scott v. State*, 64 Md.App. 311, 323, 494 A.2d 992

(1985) we held that where the evidence showed that the defendant bumped into the victim, and then they argued, there was not adequate provocation for the subsequent shooting. In the case *sub judice* the evidence showed that no physical contact occurred between the victim, Sherri Unger, and appellant. Appellant testified that Sherri "hollered" at him. This was not adequate provocation for hot-blooded provocation to mitigate murder to manslaughter.[1]

In addition, there must be a showing that the shooting was committed in the heat of passion. In *Cunningham* we held that:

As observed in this regard in *Bartram v. State, supra,* at 33 Md.App. [115] 175, 364 A.2d 1119 [1976], "The blood, however, must indeed be hot and, generally speaking, only the hot-blooded killer can attest to that." The appellant here took the stand in his own defense and testified unequivocally that he shot the victim not in hot-blooded rage, but because he feared that if he did not kill in self-defense, he would be killed or grievously wounded himself. His abject failure to provide evidence of hot-blooded motivation, as to which he was the best if not exclusive source, is as fatal here as was a similar failure to provide such indispensable evidence in *Bartram v. State:*

"In the circumstances of this case, only the appellant could have injected evidence as to an intentional but hot-blooded killing. She, however, stoutly maintained that the killing was suicidal." 33 Md.App. at 175, 364 A.2d 1119.

*Cunningham v. State, supra* 58 Md.App. at 259–60, 473 A.2d 40; *see also Tripp v. State,* 36 Md.App. 459, 469, 374

---

1. During oral argument appellant cited the cases of *People v. Spurlin,* 156 Cal.App.3d 119, 126, 202 Cal.Rptr. 663 (1984) and *State v. Russo,* 1 Boyce 538, 77 A. 743, 747 (Del.1910). These cases are inapposite since we find no evidence that Sherri aided or abetted her mother's attack on appellant.

A.2d 384 (1977). The same deficiency in the evidence is present here. Appellant, the "best if not exclusive source" of his own state of mind, testified as follows:

Q. Well up to this point now when she came at your swinging, what . . . what were your feelings? What were your emotions?

A. I don't know. When I went upstairs I wasn't mad. I mean we hollered downstairs a couple of times, you know. I mean I got tired of hearing her and I'd holler at her and I'd tell her to get sober or go get another bottle or something, you know. But she had been upstairs for a little while and the phone's ringing. And then like I said she come down to the landing or the foyer and then walked back up.

Q. Well at the point that you went upstairs you say you weren't mad. Now when she jumped up off the bed and started to swing were you mad then?

A. I don't know. I don't know if mad is the . . . more defensive I think. I don't know that you know anger and whatever goes together but I don't really . . . I was . . . I was telling her to stop it when she hit me with the phone. And . . .

Q. Were you in fear of your life at that point?

A. I ah . . . I don't think I was afraid of my life.

* * * * * *

Q. And at the time that you were in this other state of mind were there any emotions? Did you feel anger? Did you feel rage? Did you feel anything?

A. No. . . .

Therefore, appellant testified unequivocally that he was not angry or mad at either victim. We hold that appellant did not make a *prima facie* showing of the second of four elements of hot-blooded provocation. "Failure to prove any one of the necessary four elements is fatal to establishing a theory of hot-blooded provocation." *Scott v. State, supra* 64 Md.App. at 323, 494 A.2d 992; *Cunningham v. State, supra* 58 Md.App. at 258, 473 A.2d 40. "Where the facts do

not support a theory of manslaughter, no instruction need be given." *Blackwell v. State,* 278 Md. 466, 476–478, 365 A.2d 545 (1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2183, 53 L.Ed.2d 229 (1977); *Cunningham v. State, supra* 58 Md. App. at 260, 473 A.2d 40; *Tripp v. State, supra* 36 Md.App. at 463, 477–78, 374 A.2d 384. We hold that the trial court did not err when it refused to instruct the jury on the elements of manslaughter in the shooting of Sherri Unger.

## II. *Bifurcation of Trial*

■ Appellant argues that, traditionally, bifurcation of the insanity phase from the guilt or innocence phase was impermissible. Despite the recently enacted Md. Health General Code Ann. § 12–109(b) requirement that the defendant meet the burden of proving insanity, appellant contends that the traditional rule is preferable.[2] In addition, appellant avers that because the State was not diligent in its efforts to secure evidence the trial court should have denied the State's motion to bifurcate.

The State responds that the trial court has the discretion to permit bifurcation of the trial in appropriate circumstances and that the trial court properly exercised its discretion in a case such as this, where the lateness of the not criminally responsible plea was a factor.

In *Treece v. State,* 313 Md. 665, 685, 547 A.2d 1054 (1988) the Court held that:

> ... [W]e are led to the conclusion that, at least under some circumstances, it would be the better practice to bifurcate a trial in which criminal responsibility is an issue, with the decision on guilt or innocence to be made first, and then, if the verdict is guilty, the decision on

---

**2.** During oral argument, appellant cites to Comment, *Bifurcation in Insanity Trials: A Change in Maryland's Criminal Procedure,* 48 MD.L. REV. 1045, 1054 (1989) to bolster his argument that the appellant should retain the exclusive option to request bifurcation because the decision to plead not criminally responsible is predominantly a matter of trial strategy. The viewpoint expressed in the Comment is unpersuasive.

criminal responsibility. Some jurisdictions follow this sort of procedure. Should a trial court adopt this approach, the guilt/innocence phase of the proceedings would be much simplified. The merits of the criminal case would be separated from the often unrelated issue of criminal responsibility.

(Citations omitted.) The Court noted that previous decisions held bifurcation is not permissible in Maryland when the issue of criminal responsibility is raised. These previous decisions were distinguished on the basis that they all antedate the major revisions of statutory law accomplished by Ch. 501, Acts of 1984, adopting the present provisions of Title 12, Health–General Article:

These major changes in the law, shifting the burden of proof on the issue of criminal responsibility and increasing the chances of lengthy indefinite confinement for a defendant found not criminally responsible, emphasize the desirability of a bifurcated proceeding in appropriate circumstances. Moreover, they render distinguishable the earlier decisions on bifurcation. Under the present statutes, bifurcation is not precluded. Bifurcation raises a number of procedural issues, however, and it is desirable, for the long term, that there be uniform State-wide standards to govern the process. Accordingly, we shall refer the bifurcation issue to our Standing Committee on Rules of Practice and Procedure for a prompt report.

*Treece v. State, supra* 313 Md. at 686–87, 547 A.2d 1054. Judge Wright was correct *sub judice* when he held:

I think that bifurcation can be done. I don't think that the law and the history of the Court of Appeals' decisions would provide the same foundation now that it did then, pre '84, so I think that these issues can be bifurcated. The question is whether they should be bifurcated because of the reasons that the State has presented.

The standard by which the judge must make the determination was not articulated by the Court of Appeals until October, 1989, more than a year after the appellant's trial.

In *McCloud v. State*, 317 Md. 360, 364, 564 A.2d 72 (1989) the Court held:

> Because of the potential factual severability of these issues (as well as their legal severability), we concluded in *Treece* that *under the present statutory provisions a trial court has discretion, in appropriate circumstances, to order bifurcated proceedings* in a criminal case in which the issue of criminal responsibility is raised.

(Emphasis supplied.) The trial court *sub judice*, navigating in uncharted waters, anticipated and applied the correct standard in its determination:

> Well the continuance if you will, or by way of bifurcation seems to me to be in the discretion of the trial court and I would only do so if I felt there was good cause shown in the interest of fairness. And I think that the situation here does cry out for a continuance of the issue of criminal responsibility and bifurcation. And I will therefore bifurcate the issue of criminal responsibility from the guilt or innocence determination and schedule that issue to be heard by continuing the case after the jury has returned a verdict on the merits.

We hold that this determination was not an abuse of discretion. In addition, the trial court's denial of appellant's subsequent motion for mistrial was a proper exercise of discretion. The trial court considered the fact that appellant did not make his "not criminally responsible" plea until four months after being charged. The day after appellant's plea was entered the circuit court ordered that he be examined at the Clifton T. Perkins Hospital. The reports generated were not available to the prosecution until February 15, 1988, the second day of trial. In the interest of justice and so that the jury would be adequately informed to decide the issue, the judge properly bifurcated the trial.[3]

---

3. In *Treece v. State, supra* 313 Md. at 687, 547 A.2d 1054, the Court noted the desirability, "in appropriate circumstances," of bifurcating trial of the issues of guilt/innocence and criminal responsibility when the latter is at issue. The bifurcation issue was referred to the

### III. *Admissibility of Photographs*

█ Appellant argues that the admissibility of photographs is determined by balancing their probative value against the potential for improper prejudice to the defendant and that the photographs in this case had no probative value because the identities of the deceased and the causes for their deaths was not disputed. Appellant argues, therefore, that the photographs of the victims only inflamed and prejudiced the jury.

The State responds that the trial court did not abuse its discretion by admitting the photographs into evidence. The photographs showed the nature and location of the victim's wounds and the positions of the bodies at the scene.

In *Johnson v. State*, 303 Md. 487, 502, 495 A.2d 1 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986) the Court was faced with the admissibility of certain photographs consisting of one color photograph of the victim at the scene of the crime and five black and white photographs contained in the autopsy. The Court stated:

> We have consistently held that whether or not a photograph is of practical value in a case and admissible at trial is a matter best left to the sound discretion of the trial judge. *Bowers v. State*, 298 Md. 115, 135–36, 468 A.2d 101, 111–12 (1983), quoting *Cook v. State*, 225 Md. 603, 608, 171 A.2d 460, 463 (1961), *cert. denied*, 368 U.S. 970, 82 S.Ct. 445, 7 L.Ed.2d 398 (1962). A court's determina-

Standing Committee on Rules of Practice and Procedure for "a prompt report." The Rules Committee proposed, and on June 28, 1989 the Court adopted new Rule 4–314, effective July 1, 1989, four and one-half months after the trial *sub judice*.

Rule 4–314(a)(1) provides that the defendant or the State may move for bifurcated trial if the defendant has pleaded both not guilty and not criminally responsible. In addition, Rule 4–314(a)(3)(B) provides "[t]he court may grant a motion made by the State if it finds and states on the record (i) a compelling reason to bifurcate the trial and (ii) that the defendant will not be substantially prejudiced by the bifurcation." Although Rule 4–314 does not apply to the earlier trial of appellant, it's remarkable that the trial judge's decision would have been in nearly complete compliance with the requirements of that Rule.

tion in this area will not be disturbed unless plainly arbitrary. *Id.* Under this standard, we have permitted the reception into evidence of photographs depicting the condition of the victim and the location of injuries upon the deceased, *Clarke v. State*, 238 Md. 11, 21–22, 207 A.2d 456, 461–62 (1965); the position of the victim's body at the murder site, *Brice v. State*, 264 Md. 352, 368–69, 286 A.2d 132, 140 (1972); and the wounds of the victim, *Madison v. State*, 200 Md. 1, 7–8, 87 A.2d 593, 595 (1952). On certain occasions, photographs have also been admitted to allow the jury to visualize the atrociousness of the crime—a circumstance of much import where the fact finder must determine the degree of murder.

*Id.* There the Court affirmed the trial judge's ruling to admit the photographs. In *Johnson* the Court noted that it has held consistently that the photographs of the deceased are admissible even where the location of injuries was previously described and conceded by defendant. *Johnson, supra,* 303 Md. at 503, 495 A.2d 1.

As recently as November 29, 1989 the Court held that nine color photographs—four showed the scene and full body of the victim from different angles, four were close-ups of the victim's head injuries from different angles, and the last showed injuries on the victim's hand and arms caused by being bound with bedroom curtains—were admissible despite the defendant's argument that they were irrelevant to the only issue to be decided, that of criminal agency. *Bedford v. State*, 317 Md. 659, 566 A.2d 111 (1989).

Under these circumstances and based on our inspection of them, we hold that the trial court did not abuse its discretion by admitting the black and white photographs from the autopsy report and the three color photographs of the victims at the crime scene. *Johnson v. State, supra,* and the cases cited therein.

## IV. *In Court Demonstration*

 Finally, appellant argues that the trial court erred by ordering him to hold the gun as he did during the

shooting despite appellant's objection. Appellant argues the demonstration was unnecessary because appellant had already testified how he held the gun, therefore, unfair prejudice resulted.

The State responds that the gun demonstration ordered by the trial court was probative of the appellant's ability to recall the shooting, therefore, it was properly admitted.

A trial judge is "vested with wide discretion in the area of permitting or denying demonstrations" and his decision should not be disturbed on appeal unless abuse is apparent. *Brooks v. State*, 24 Md.App. 334, 346, 330 A.2d 670, *cert. denied*, 275 Md. 746 (1975); *see also Morris v. State*, 59 Md.App. 659, 671, 477 A.2d 1206 (1984). Of critical importance to the case against appellant was his state of mind at the time of the shooting. Throughout the trial appellant averred that he entered a dream-like state before getting the gun. While in this state he could not remember what specifically happened until he had emptied the rifle. The ability of appellant to remember exactly how he held the rifle is probative of the possible inference that appellant was indeed capable of recalling, in detail, the circumstances of the shootings. The trial judge did not abuse his discretion in ordering appellant to demonstrate how he held the rifle.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.