579 A.2d 788

**Charles LEAK**

v.

**STATE of Maryland.**

**No. 1691, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Sept. 27, 1990.

Diane G. Goldsmith, Assigned Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for appellant.

Audrey A. Creighton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Stuart O. Simms, State's Atty. for Baltimore City, on the brief), Baltimore, for appellee.

Argued before ALPERT, BLOOM and CATHELL, JJ.

BLOOM, Judge.

A jury in the Circuit Court for Baltimore City convicted appellant, Charles Leak, of robbery. Pursuant to a recidivist statute, Md.Code (1957, 1987 Repl.Vol., 1989 Supp.), Art. 27, § 643B(c), appellant was sentenced to imprisonment for 25 years without parole.

Appealing from that judgment, Leak contends that the trial court erred in denying his motion for a mistrial because the prosecutor, during his opening statement, referred to a certain check-writing machine, in violation of the court's ruling on a motion *in limine.* He also contends that the court erred in permitting the State to introduce other

crimes evidence in the form of testimony concerning the theft of the check-writing machine and the presence of appellant's fingerprints on it. Lastly, appellant asserts that the trial judge questioned a defense witness in an impermissible manner that demonstrated the court's disbelief in the witness's testimony.

*Facts*

At approximately 4:30 p.m. on 30 November 1987, a white AMC Concord automobile, driven by Charles Leak, stopped in front of the Caton Avenue Shell Station in the 3200 block of Georgia Avenue. Kenneth Burkes, after alighting from the car, entered the gas station and demanded money from the attendants, Cindi Wood and Sherry Houghtling, threatening them with what they believed to be a concealed gun. After taking the money, Burkes forced the two women into a refrigerator in the back of the store and then escaped.

John Wissman, an off-duty police officer dressed in plainclothes, was on the scene putting gasoline in his car at the time of the robbery. He saw Burkes enter and exit the station and leave in the AMC Concord. When the victims left the refrigerator, they related their story of the robbery to Wissman. He immediately got into his car and began pursuing the car with Burkes in it.

Wissman followed the AMC Concord to the intersection of DeSoto Road and Georgetown Avenue where it stopped for a red light. Wissman drove around three other vehicles and attempted to block the Concord. Appellant, however, jumped the curb and sped southbound on DeSoto Road. When the AMC suddenly stopped and pulled to the curb on the 1900 block of Whistler Avenue, Burkes got out of the car and began to run. Officer Wissman exited his car and chased Burkes on foot, but was unable to catch him. Wissman then supplied other police officers with the make, model, and license number of the escape car.

The AMC was owned by appellant's girl friend, Phyllis Washington, who lived at 535 Half Mile Court in Baltimore

City. When Officer Wissman arrived at this address, the AMC was parked there, so he waited for other officers to arrive. At 5:30 p.m., he observed a black male, who was later determined to be appellant, emerge from 535 Half Mile Court, open the trunk of the AMC, and start to remove a white sack containing a check-writing machine, which turned out to be stolen. The officer left his car and attempted to apprehend appellant, but was unable to catch him. After interrogating Ms. Washington, the police obtained a warrant for appellant's arrest. Appellant was arrested at noon on 21 December 1987.

Appellant submitted a motion *in limine* to exclude any attempt by the State to introduce evidence concerning the stolen check-writing machine that was in the trunk of the AMC. The checkwriter, which had been stolen from the Dash–In in Baltimore County on 30 November 1983 at about 1:30 p.m., had appellant's as well as Burkes's fingerprints on it. Appellant asserted that any mention of the checkwriter would be unduly prejudicial while having little or no probative value. The State argued that since both Burkes's and the appellant's fingerprints had been lifted from the checkwriter it was an essential piece of evidence that could place appellant with Burkes as early as one o'clock in the afternoon on the day of the robbery. The court granted appellant's motion, excluding admission or mention of the checkwriter, but limited its holding. If, during the testimony of either appellant or Burkes, statements were made that could be impeached by questioning the witness about the checkwriter theft, then the court would permit that line of questioning.

I

Appellant contends that he should have been granted a mistrial by the trial court because the prosecuting attorney mentioned the check-writing machine in his opening statement after the court had specifically limited the admissibility of this evidence by granting the appellant's motion *in limine*. "It has been repeatedly held that a trial

judge shall declare a mistrial only under extraordinary circumstances and where there is a manifest necessity to do so." *Russell v. State,* 69 Md.App. 554, 562, 518 A.2d 1081 (1987). Even if the prosecutor's statement during opening argument was, in fact, improper, the record must compellingly demonstrate sufficient prejudice to warrant granting such a drastic measure.

■ This Court rarely finds that a trial court abused its discretion by refusing to grant a request by one of the parties for a mistrial.

A request for a mistrial in a criminal case is addressed to the sound discretion of the trial court and the exercise of its discretion, in a case involving a question of prejudice which might infringe upon the right of the defendant to a fair trial, is reviewable on appeal to determine whether or not there has been an abuse of that discretion by the trial court in denying the mistrial. The decision by the trial court in the exercise of its discretion denying a mistrial will not be reversed on appeal unless it is clear that there has been prejudice to the defendant.

*Wilhelm v. State,* 272 Md. 404, 429, 326 A.2d 707 (1974) (citations omitted).

■ Before this Court will decide that the trial court abused its discretion by not granting a party's motion for a mistrial, we would have to find clear and egregious prejudice to the defendant mandating us to reverse the conviction. Merely because the prosecutor made improper remarks does not compel us to reverse the lower court. More prejudice is needed to justify this sanction. Improper conduct or remarks made by the State during a prosecution would have to be a direct and contributing factor that resulted in substantial prejudice to the defendant. *Wilhelm, supra.*

■ In the case at bar, the prosecutor in his opening statement described the situation when Officer Wilson watched the defendant attempt to remove the check-writing machine from the trunk of his girl friend's car. Objecting and calling for a mistrial, the defense counsel argued that

the State's opening argument violated the judge's grant of the motion *in limine*. The State, on the other hand, argued that it did not intend to violate the court's ruling, but only to set the stage and introduce the device to the jury for the purpose of eventually admitting the fingerprints into evidence. The court instructed the prosecutor:

> that the facts generate the issue, not your opening statement because, quite frankly, I don't know what you're going to say next. So it is a crucial area, and since you have to prove the case not in your opening statement leave it alone in your opening statement.

The prosecutor was thus instructed to avoid further reference to the check-writing machine during his opening statement. Since, as of that time, there had been no mention of a theft of the machine, the brief reference to the object in the prosecutor's opening statement did not prejudice appellant to the extent that a mistrial was called for. We hold, therefore, that the court did not err or abuse its discretion in denying appellant's mistrial motion.

## II

Appellant contends that the trial court erred when it allowed the State to impeach defense witness Burkes by questioning him about the check-writing machine and how he obtained it. At trial, defense counsel made a continuing objection to the prosecutor's questions about the check-writing machine. Appellant now asserts that cross-examining the witness about the machine was a poorly disguised attempt to elicit inadmissible other crimes evidence. The State, however, contends that this point was not preserved for appellate review.

In *Brecker v. State*, 304 Md. 36, 39–40, 497 A.2d 479 (1985), the Court stated, "[O]ur cases have consistently stated that when an objector sets forth the specific grounds for his objection, although not requested by the court to do so, the objector will be bound by those grounds and will ordinarily be deemed to have waived other grounds not specified." *See* Md. Rule 4–323(c). When defense counsel

in this case objected to questions concerning the check-writer during the prosecutor's cross-examination of Burkes, he explicitly stated two bases for his objections: irrelevancy and beyond the scope of direct examination. The State argues that appellant may not assert on appeal that the court erred in admitting other crimes evidence because he did not ground his objection on that basis at trial. We reject that argument. When other crimes evidence is inadmissible, it is rejected because of its lack of relevancy; if such evidence is relevant to some material issue, such as motive, intent, identity, lack of mistake, etc., it is admissible. *Ross v. State,* 276 Md. 664, 350 A.2d 680 (1976). In *Harris v. State,* 81 Md.App. 247, 567 A.2d 476 (1989), Judge Moylan, writing for this Court, explained that inadmissible other crimes evidence is not totally irrelevant, since it tends to prove the defendant's propensity for crime. Relevancy for that purpose, however, does not render such evidence admissible. To be admissible, other crimes evidence must be relevant to something other than propensity. No matter how the rule is stated with respect to admissibility or inadmissibility of other crimes evidence, however, an objection to the admission of such evidence on the grounds that it is irrelevant will preserve the issue for appellate review because admissibility of such evidence hinges on its relevancy to a proper subject of inquiry.

We proceed, therefore, to a consideration of appellant's contention that the court erred in admitting evidence of Burkes's theft of the checkwriter, which, when recovered, had appellant's fingerprints on it. Clearly, that evidence was not required to impeach the general credibility of the witness, who freely admitted that he committed the robbery. Equally clearly, it was highly prejudicial to appellant, since it tended to indicate that he had participated in the theft of the check-writer, thereby amounting to evidence that appellant had committed some crime other than the one for which he was being tried.

The State asserts that the evidence was admissible as it tended to impeach Burkes's testimony that he saw appellant

for the first time that day sometime between 3:00 and 4:30 p.m. The checkwriter was stolen earlier that afternoon; from the presence of appellant's fingerprints on it, the State posits, the jury could infer that appellant had participated in its theft and thus had been with Burkes since long before the robbery. That, in turn, casts doubt on Burkes's version that he had just met with appellant and acted on his own, without appellant's prior knowledge, when he robbed the Caton Avenue Shell Station.

The problem with that argument is that appellant's fingerprints on the stolen object do not necessarily connect him with the theft, and for other crimes evidence to be admissible even if relevant to an issue other than propensity "the accused's involvement in the uncharged crime must be established by clear and convincing evidence." *Govostis v. State,* 74 Md.App. 457, 464, 538 A.2d 338, *cert. denied,* 313 Md. 7, 542 A.2d 844 (1988).

Burkes had testified that appellant had nothing to do with the theft of the checkwriter; that he brought the machine to appellant's automobile and appellant put it in the trunk of the car at Burkes's request; and that when he told appellant he had robbed the Shell station appellant ordered him out of the car and he left the checkwriter in the trunk. Later that day, the police saw appellant remove the checkwriter from the trunk. According to the evidence, therefore, there were two opportunities for appellant to touch the checkwriter hours after Burkes stole it. Fingerprints of the accused at the scene of a crime or on stolen goods have no probative value to connect the accused with the crime unless circumstances indicate that the prints were impressed at the time of the crime. *Chandler v. State,* 23 Md.App. 645, 329 A.2d 430, *cert. denied,* 274 Md. 726 (1974); *DiPietro v. State,* 31 Md.App. 392, 356 A.2d 599 (1976).

### III

Our holding that the court erred in permitting the State to question Burkes about the stolen checkwriter requires

that we reverse and remand for a new trial on that issue. It is not necessary, therefore, that we address the remaining complaint, that the trial judge assumed a prosecutorial role by questioning a key defense witness in such a manner as to display disbelief in that witness's testimony. We choose to address that contention, nevertheless, since it involves an important matter of a recurring nature.

Burkes's appearance as a defense witness was a relatively brief one; his testimony produced just 45 pages of trial transcript. The trial judge's questions to the witness and the witness's responses thereto cover eight of those pages. It is appellant's contention that the trial judge assumed the role of prosecutor in questioning the witness and so prejudiced appellant's defense that a mistrial was mandated. A motion for a mistrial on that basis was made and denied.

In *Vandegrift v. State*, 237 Md. 305, 206 A.2d 250 (1965), the Court of Appeals explained that questioning of a witness by the trial judge "showing his disbelief of the witness's testimony [is] beyond the line of impartiality over which a judge must not step." *Id.* at 311, 206 A.2d 250. The Court held that it was reversible error for the trial judge to question a witness repeatedly on the same matter and to remind the witness that he was under oath and subject to penalties for perjury. Such conduct by the trial judge "amounted to a manifestation of his disbelief of the witness" which presumably influenced the jury, as a result of which the Court concluded that the manner of questioning by the trial judge constituted prejudicial error. *Id.* at 310, 206 A.2d 250. Similarly, in *Brown v. State*, 220 Md. 29, 150 A.2d 895 (1959), the Court stated that the trial judge's questioning of the defendant, which "indicate[d] sarcastically, so that the jury could not have failed to understand, that the judge did not believe the story the defendant was telling," was "clearly improper."

We had occasion to address the limits of permissible interrogation of witnesses by a trial judge in *Smith v. State*, 66 Md.App. 603, 505 A.2d 564, *cert. denied*, 306 Md. 371, 509 A.2d 134 (1986). In *Smith*, we found the late

Judge Lowe's observations in *Bell v. State,* 48 Md.App. 669, 429 A.2d 300, *cert. denied,* 291 Md. 771 (1981), to be sufficiently enlightening to bear repeating:

> The trial judge's role is that of an impartial arbitrator and that appearance is not generally compatible with an inquisitorial role. It is the better practice for a trial judge to inject himself as little as possible in a jury case, *United States v. Green,* 429 F.2d 754, 760 (D.C.Cir.1970), because of the inordinate influence that may emanate from his position if jurors interpret his questions as indicative of his opinion. *See, also, Patterson [v. State],* 275 Md. 563, 578–80 [342 A.2d 660] (1975). The appearance that a judge may have abandoned his role as an impartial arbitrator, is especially hazardous when cross-questioning a defendant.
>
> Yet, if counsel have faltered in their advocacies, it is not improper for a trial judge to be "meticulously careful to make sure that the full facts [are] brought out," *Jeffries v. State,* 5 Md.App. 630, 632 [248 A.2d 807] (1969), or to seek to discover the truth when counsel have not elicited some material fact, or indeed when a witness has not testified with entire frankness. Annot., 84 A.L.R. 1172, 1193 (1933). Such questioning may even bear upon the credibility of a defendant in a proper circumstance. *Madison v. State,* 200 Md. 1, 12 [87 A.2d 593] (1952); *King v. State,* 14 Md.App. 385, 393–94 [287 A.2d 52] *cert. denied,* 265 Md. 740 (1972). This should be achieved expeditiously, however, if at all, for a protracted examination has a tendency to convey to a jury a judge's opinion as to facts or the credibility of witnesses.

*Smith,* 66 Md.App. at 618–19, 505 A.2d 564 (quoting *Bell v. State,* 48 Md.App. at 678, 429 A.2d 300).

■ The extent to which the trial judge should or may intervene to question a witness, therefore, involves the drawing of a fine line between assisting the jury by bringing out facts and "sharpening the issues," which is permissible, and influencing the jury's assessment of facts or of a witness's credibility by indicating his own opinions, which is

not permissible. It is not always apparent to an appellate court reviewing a printed record whether a trial judge has crossed that line. As we noted in *Cardin v. State*, 73 Md.App. 200, 230, 533 A.2d 928 (1987):

Whether a trial judge's interrogation of a witness or party has in fact conveyed to the jury the judge's opinion as to the facts or the credibility of the witness must be determined by all the facts and circumstances attending the questions posed by the trial judge in each particular case. What would be an innocuous question in one circumstance could be highly prejudicial in another. In many instances, much will depend upon the judge's tone of voice, facial expression, or other factors that cannot be assessed by reviewing a cold printed record devoid of expression or inflection. We must make our determination on the basis of the language of the questions alone.

■ . We believe the trial judge crossed that line in this case. He had been told by defense counsel at a bench conference that counsel was reluctant to call Burkes as a witness because he understood that the witness intended to give testimony that was at considerable variance from statements the witness had given counsel. Appellant, however, insisted that the witness be called. The witness, who had already pleaded guilty to the theft of the checkwriter and the robbery of the Shell Station pursuant to an agreement fixing his sentence, appeared eager to testify on behalf of appellant. The court, out of the presence of the jury, explained to the witness that he was still entitled to Fifth Amendment protection against self-incrimination and advised him of the perils of perjury.

Despite the warnings and advice, Burkes chose to testify. He said that he alone stole the checkwriter, about 1:00 p.m., with a view to selling it and using the money for drugs. A friend, not appellant, gave him a ride from the scene of that theft. Later, about 3:30 p.m., he met up with appellant and obtained a ride from him. Appellant, at Burkes's suggestion, put the checkwriter in the trunk of the car. Then, at Burkes's request, appellant stopped at the Shell Station so

Burkes could purchase a soda. After Burkes committed the robbery, he got back into appellant's car; appellant did not know about the robbery at that point. Later, as they were driving along, Burkes told appellant about the robbery, and appellant immediately stopped the car and told Burkes to get out.

After vigorous cross-examination of Burkes by the prosecutor, including questions concerning his guilty pleas and their effect on his willingness to help appellant in the case at bar, defense counsel asked a few questions relating to Burkes's plea bargain. Then the trial judge began questioning the witness.

> THE COURT: Mr. Burkes, since you have been in the Baltimore City Jail, since last December of 1987, approximately how many separate occasions have you seen Mr. Leak?
>
> THE WITNESS: Usually when I go out in the yard, maybe three or four times a week.
>
> THE COURT: Three or four times a week?
>
> THE WITNESS: Maybe in passing around in the cafeteria.
>
> THE COURT: And during those three or four times a week how may occasions did you have to speak with Mr. Leak?
>
> THE WITNESS: Not that many.
>
> THE COURT: How many?
>
> THE WITNESS: Not that many because of security over there, it's no talking to each other, just passing in the cafeteria or maybe out in the yard.
>
> THE COURT: Answer my question. How many times have you spoken to Mr. Leak since you have been in the Baltimore City Jail?
>
> THE WITNESS: About ten times.
>
> THE COURT: And during those discussions have you discussed this case and what happened?
>
> THE WITNESS: No, sir.

THE COURT: You mean he got arrested for something that you said you did and he never asked you about it?

THE WITNESS: He asked me maybe once.

THE COURT: What did he ask you?

THE WITNESS: Was I going to take the stand to testify.

THE COURT: And did he ask you what you were going to say if you took the stand?

THE WITNESS: No, sir.

THE COURT: Did you try to explain to him what happened that day?

THE WITNESS: Well, I did. We were in the car, Your Honor. After I rode a few blocks I told Mr. Leak what I had done and at that time he made me get out of the car. Over at the jail I seen him every now and then, but we don't hold no conversation about the case.

THE COURT: Since you have been in the Baltimore City Jail have you tried to explain what happened that day?

THE WITNESS: I told him that I was sorry for what I did.

THE COURT: Earlier on the day of the 30th of November, when you took the checkwriter from the establishment on Route 40, did you plan a means of escape?

.    .    .    .    .

THE WITNESS: From Baltimore County?

THE COURT: Yes. How did you plan to get away?

THE WITNESS: I had a ride.

THE COURT: That person knew what you were doing at Day's Inn?

THE WITNESS: No.

THE COURT: Twice in the same day you got a ride with somebody who you didn't tell you were involved in a theft?

THE WITNESS: I was involved with a theft, I had a ride, I left and came back.

THE COURT: Did the person that you got the ride with to Day's Inn know that you were going in there to steal, yes or no?

THE WITNESS: Yes.

THE COURT: What kind of car was that person driving?

THE WITNESS: It was their own car.

THE COURT: What kind of car was that?

THE WITNESS: A blue Citation.

THE COURT: And later that same day you had an opportunity to commit another robbery, is that correct?

THE WITNESS: Yes.

THE COURT: Where did the person in the blue Citation let you out?

THE WITNESS: In town about a block from where I lived.

THE COURT: Where?

THE WITNESS: Lafayette.

THE COURT: What is the cross street there?

THE WITNESS: Poplar Grove and Lafayette.

THE COURT: If they let you out at Lafayette and Poplar Grove what were you doing up on Hilton and Route 40 with the checkwriter?

THE WITNESS: On Hilton and Frederick.

THE COURT: Hilton and Frederick which is further away from Lafayette.

THE WITNESS: I have a friend that lives in the 2600 block of Frederick, right off of Hilton Road.

THE COURT: If you had stolen something earlier that day and that person took you home, why did you come back out with the stolen property on the street?

    .    .    .    .    .

THE COURT: How did you get from Lafayette and home and from Hilton and Frederick Avenue?

THE WITNESS: I walked from Lafayette and from Hilton I walked straight up Frederick Avenue, that's not far.

THE COURT: Answer my question, how did you get from home?

THE WITNESS: I walked.

THE COURT: What time did you leave home?

THE WITNESS: That afternoon about 2:30 or three o'clock.

THE COURT: So it took you a half an hour to walk from Lafayette Avenue to Hilton and Frederick?

THE WITNESS: More like 45 minutes at the most.

THE COURT: If you left home at 2:30 and it took you 45 minutes, that would be a quarter to four, you said that you met the defendant not earlier than 3:30?

THE WITNESS: Around that time, 3:30 or a quarter to four.

THE COURT: He stopped you or you stopped him?

THE WITNESS: I stopped him.

THE COURT: How did you know it was him?

THE WITNESS: I seen him in the neighborhood before and I seen his car and I flagged him down. I was trying to get a ride either way, going north or either south.

.　　.　　.　　.　　.

THE COURT: Did there ever come a time during the pursuit by the unknown person with a gun that Mr. Leak took any evasive driving actions?

THE WITNESS: We turned the corner.

THE COURT: Was it in vain that you turned the corner?

It was at that moment that defense counsel objected. At a bench conference, counsel protested that the trial judge had assumed a prosecutorial role in cross-examining the defense witness. He moved for a mistrial. That motion was denied and the judge resumed his interrogation of the witness.

THE COURT: Mr. Burkes, you were telling us all about turning the corner, tell me about it.

THE WITNESS: The turn was a right turn, I don't remember the name of the street, that's when I told Mr. Leak that I had took some money from out of the store and that was when it was about the time I seen the car.

THE COURT: I ask you a question: during the course of being followed by this person with the gun drawn, did Mr. Leak take any evasive driving actions, yes or no?

THE WITNESS: No, sir.

THE COURT: He never cut across the curb or made a fast turn or went speeding down the street in excess of the speed limit?

THE WITNESS: He turned the corner.

THE COURT: Cars turn the corner all the time in exceptional ways, I am talking about the way this car turned the corner?

THE WITNESS: No.

THE COURT: He was driving normally until the time he put you out of the car?

THE WITNESS: Yes, as far as I know.

Even in the absence of any indication as to intonation, facial expression, or "body language," it is apparent to us from the nature of the questions that the interrogation was not for the purpose of sharpening the issue or bringing out the full facts of the case being tried. We cannot escape the conclusion that the purpose of the interrogation was to impeach the witness. The questions themselves could not fail to convey to the jury the judge's opinion of the witness's credibility. That is not the proper role of a trial judge, who must maintain the appearance of an impartial arbitrator.

JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.

COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.