IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

## RONALD BRADFORD WALLER v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 210655     Douglas A. Meyer, Trial Judge**

---

**No. E1999-02034-CCA-R3-PC  - Decided July 18, 2000**

---

The petitioner was convicted in the Hamilton County Criminal Court in 1992 of first degree murder, especially aggravated robbery, and theft over $1,000, receiving an effective sentence of life plus twenty-three years.  The convictions and sentences were affirmed on direct appeal in 1993; and the petitioner subsequently filed a petition for post-conviction relief, presenting as issues, whether there was a variance between the indictment and the proof, whether he was improperly compelled to participate in a courtroom demonstration, whether he received ineffective assistance of counsel at trial and on direct appeal, whether his convictions constitute double jeopardy, whether the trial court erred in evidentiary rulings, whether he was improperly convicted because of prosecutorial misconduct or cumulative errors at the trial, and whether his convictions amount to a miscarriage of justice.  Finding no error, we affirm the judgment of the trial court denying the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

GLENN, J., delivered the opinion of the court, in which HAYES, J., and WALKER, SP.J., joined.

Ronald Bradford Waller, Pikeville, Tennessee, Pro Se.

Paul G. Summers, Attorney General and Reporter, Ellen H. Pollack, Assistant Attorney General, William H. Cox, III, District Attorney General, and C. Leland Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The petitioner, Ronald Bradford Waller, appeals as of right from the Hamilton County Criminal Court's denial of his petition for post-conviction relief after an evidentiary hearing.  The petitioner was convicted in 1992 of first degree murder on counts alleging both premeditation and felony murder; especially aggravated robbery; and theft of property valued at more than $1,000. The petitioner received a life sentence on the first degree murder charge; twenty years as a Range I offender on the especially aggravated robbery charge, a Class A felony; and three years as a Range I offender on the theft charge, a Class D felony.  The latter two sentences were ordered to be served concurrently with each other and consecutively to the life sentence for an effective sentence of life

plus twenty-three years in the Department of Correction.

On direct appeal, the petitioner raised four issues: (1) whether the evidence was sufficient to support the verdicts; (2) whether the petitioner was prejudiced by the delayed admission of alleged homosexual conduct on the part of the victim; (3) whether the petitioner's convictions of first degree murder and especially aggravated robbery could both stand; and (4) whether consecutive sentencing was proper. See State v. Ronald B. Waller, No. 03C01-9212-CR-00429, 1993 WL 398452, at *1 (Tenn. Crim. App., Knoxville, Oct. 6, 1993), perm. app. denied (Tenn. Feb. 7, 1994). This court found no merit to these issues and affirmed the judgments. See id.

On May 10, 1996, the petitioner filed a petition for post-conviction relief with the Hamilton County Criminal Court. After a full evidentiary hearing, petitioner's application for post-conviction relief was denied.[1] In the present appeal, the petitioner alleges a substantial number of grounds for relief, which we organize in the following manner:

I.     Whether an unconstitutional variance to the indicted offense of felony murder occurred during the trial;

II.    Whether petitioner was improperly compelled to participate in a demonstration during trial and in the presence of the jury;

III.    Whether petitioner was denied effective assistance of counsel both at trial and on direct appeal;

IV.    Whether petitioner's convictions violated principles of double jeopardy;

V.    Whether the trial court's evidentiary rulings involving photographs, a writing, and expert testimony amounted to reversible error;

VI.    Whether alleged improper comments, arguments, and participation in a demonstration resulted in prosecutorial misconduct amounting to reversible error;

---

[1]The procedural background of this case includes a remand for further findings of fact and conclusions of law based on this court's initial review of the post-conviction court's denial of post-conviction relief. See Ronald Bradford Waller v. State, No. 03C01-9702-CR-00054, 1998 WL 743654 (Tenn. Crim. App., Knoxville, Oct. 15, 1998). We did not reach the merits of petitioner's claims. Subsequent to that remand, the post-conviction court, in a ten-page document, denied the petition for post-conviction relief. It is this denial that we now review.

VII.     Whether cumulative errors resulted in a trial that was
         fundamentally unfair; and

VIII.    Whether petitioner's convictions were the result of a
         fundamental miscarriage of justice.

After a painstaking examination of the voluminous record and a thorough consideration of the issues presented, we find no reversible error and therefore affirm the post-conviction court's order denying the petition for post-conviction relief.

## FACTS

The facts of this case have been set out fully in our opinion on direct appeal. The petitioner testified at trial that he left San Francisco, California, on December 26, 1990, to hitchhike to his mother's home in Port Richie, Florida. He was twenty-two years old at the time, and was 6'1" tall. On New Year's Eve, he arrived in Cleveland, Tennessee, where he spent a few days visiting friends. On January 9, 1991, the petitioner was back on the highway, hitchhiking to Florida. His first ride took him as far as the interchange of Interstates 24 and 75. He walked to a spot where he could catch a ride headed south on Interstate 75 towards Atlanta. Two cars stopped, and he accepted a ride from the victim, Harold Jewell, in his red, 1975 Chevrolet Impala.

Sissy Holloway, the night clerk at the Quality Inn located at Interstate 75 and Ringgold Road, just outside Chattanooga, testified that she checked the victim into a room at 11:30 p.m. Jewell signed the registration card with the name Howard Johnson and gave an Atlanta address. Jewell was accompanied by a neat-looking young man in his early twenties. The petitioner admitted that he was the individual with Jewell.

Floyd Fuller, the Director of Corrections for Hamilton County, who also lived at the Beaver Creek Apartments, testified that in the early morning hours of January 10, 1991, he was awakened by loud screams for help. He looked out his window in the direction of the screams and saw two males outside in the backyard area behind the building next to his. The taller of the two was pulling the other back towards the neighboring building. Fuller jumped into sweat pants and ran outside while his wife called the police. The police arrived at the apartment complex at approximately 2:00 a.m. and, after surveying the area using flashlights, found nothing amiss.

Iris Anderson testified that she cleaned the victim's apartment regularly and, on January 10, she arrived at about 9:30 a.m. She noticed that the victim's car was gone, so she used her key to enter the apartment. Inside she was surprised to find lights on since she assumed that Jewell was not at home. She called out to him and then turned to the living room area where she saw his body lying in a pool of blood.

The petitioner testified that Jewell had offered to let him stay at the motel and then drive on to Atlanta with him the next day. The petitioner only wanted to shower and then be on his way. Once in the motel room, according to the petitioner, the victim, while pretending to retrieve some

-3-

items from the bathroom, watched the petitioner shower through a clear shower curtain and then, once the petitioner emerged from the bathroom, propositioned the petitioner to take part in sexual activity. The petitioner testified that Jewell was lying naked on the motel bed. The petitioner further testified that he refused, and the victim then forced him at gunpoint to ride to the victim's home which was not in Atlanta but at the Beaver Creek Apartments, some ten-minutes' drive away.

The petitioner testified that when he and the victim reached the apartment in the early hours of January 10, the victim, still holding a gun on him, told him to get undressed. The petitioner then described a struggle that included his reaching for a knife in his pants pocket; somehow flipping it open and knocking the gun out of Jewell's hand. In the struggle, Jewell partially folded the knife back over the petitioner's finger, cutting it. The petitioner testified that he pushed the victim down and then, with his jeans still halfway down, opened the patio door and hobbled into the grass where he fell down. The victim followed him; they both cried for help and continued the struggle. Finally, Jewell told the petitioner he could collect his belongings and leave. The petitioner's belongings consisted of a small daypack with a sleeping bag attached to the bottom; a jacket; and a shoulder bag in which the petitioner testified he kept a road map, his money, an address book, and a .25 caliber automatic pistol. The pistol, one shell, and the clip were in a smaller tan pouch inside the shoulder bag. At one point, the petitioner testified that all of his belongings were locked in the car. Later, in explaining why he went back into the apartment with Jewell after the fight, the petitioner testified that the jacket and shoulder pouch with the gun were inside the apartment. Wherever those belongings were, the knife, which the petitioner testified had sentimental value, was apparently in the apartment on the floor.

The petitioner further testified that, once back inside the apartment, a new fight ensued, with the victim reaching for the gun and the petitioner trying to stop him. At this point, the petitioner grabbed a knife with a porcelain handle that was lying on a cabinet. According to the petitioner, Jewell grabbed the petitioner's arm, bit the petitioner's finger, and continued to struggle to reach the gun that was on the floor. The petitioner testified that the two were standing up, and he cut the victim until the victim stopped as both fell to the floor.

When he saw the police arrive, the petitioner testified he ran out of the apartment and hid in some bushes because he was frightened. He took off his socks, shoes, and pants, thinking they were bloody, and hid them beside an air conditioning unit.

Once the police left, the petitioner returned to the apartment where he began to search for something to wrap around his bleeding hand. In the victim's bedroom, he found a bandana in a dresser drawer. An empty gun holster fell out onto the floor. He looked in the victim's closet for pants to wear and broke into the victim's briefcase to get his car keys. He also took a jar of change that he found in a closet and some Xanax pills that were in one of four bottles of pills in the victim's briefcase. He got in the victim's car and first drove back to the Quality Inn to think through what he should do, but the room was locked. He then drove to Florida, arriving on the same day, January 10.

On January 12, Officer Longworth of the Port Richie Police Department was on patrol and

noticed the red Chevrolet parked at the petitioner's mother's residence. Longworth checked the tag number through a computer system and discovered that the car was stolen in the course of a homicide. He called for assistance and, at about 2:15 a.m. on January 12, knocked on the door of the petitioner's mother. The petitioner came to the door and was immediately taken into custody.

The State's proof included the testimony of Dr. Frank King, medical examiner for Hamilton County. He noted that the victim was a fifty-one-year-old male, 5'6" tall, weighing 150 pounds. The victim's personal physician described Jewell as having decreased pulmonary function compatible with emphysema. Jewell was a heavy smoker.

Dr. King testified that he found multiple, blunt trauma injuries to the victim's face, including both eyes, his forehead, the side of his nose, and both corners of the mouth. Dr. King testified that these wounds were potentially fatal and could not have been caused by a fall but by multiple blows, possibly by a fist. Dr. King testified further as to bruising injuries on the victim's hands and arms:

> Q. In your opinion, what do they indicate or are they indicative of, the bruising to the hands?
>
> A. The contusions -- the pattern of injury of these contusions on the hand is consistent with what's called defensive wounds. If a person is in a fight, they are defending themselves against blows from a blunt object, they tend to block those blows with the backs of the arms or hands. Sometimes you see one or both hands and arms involved. In this particular case, Mr. Jewell being an older gentleman, less physically able to fight, this pattern of injury fits the expected defensive posture of someone of his age, size and so on and that is simply to cover up with his hands, exposing the backs of his hands and arms to blunt trauma blows. These injuries would not be expected in this pattern had the decedent made a fist and struck things with his fist. In that case you would tend to see injuries over the bony prominences, the knuckles of the fingers and hands and so on. I would say these are consistent with a defensive action or posture by the decedent. . . .
>
> Q. All right, tell us about the injury to the neck and throat area, Doctor.
>
> A. The injury to the front of the neck consisted of multiple incisional wounds applied from side to side across the neck, the full width of the neck from side to side. This incisional wound actually consisted of multiple separate passes of a sharp instrument across the neck because the different cuts overlap going through the same open injury in the neck. I

-5-

can't say exactly how many times a sharp edge was passed across the neck. I can only estimate about ten or fifteen.

Q. Ten or fifteen?

A. Yes, separate forceful incisions across the neck. This incisional wound was quite deep and extended completely through the airway to the thyroid gland, to the left side of the hyoid bone, which is a small bone in the neck, also completely through the esophagus which is the food swallowing tube from your mouth to your stomach and also severed both carotid arteries which supply blood to the face and brain and also both jugular veins which take blood from the head back down through the neck to the chest. An injury of this sort is obviously fatal and [I] would not expect the decedent to survive very long after receiving that injury.

Dr. King testified that one part of his investigation involves relating the body to the findings at the scene. This investigation includes the review of pictures and evidence from the scene. Dr. King testified that:

In this case, the scene photographs show the decedent face down on the floor with his left arm under his head and his right arm sort of under his body also. The blood present on him as he is on the floor is coming almost all from his neck and goes straight down onto the floor and actually goes over this left arm down onto the floor. The blood at the scene was immediately under his face, neck and chest area in a big pool.

Joseph Errera, a special agent with the FBI, testified as a serology expert. Based on known blood samples from both the petitioner and the victim, Errera testified that blood samples from the living room carpet and the utility room area of the victim's apartment, from the gun at the scene, and from the back of the T-shirt found underneath the victim all came from petitioner. Errera testified that blood on the inside and outside surfaces of the rear patio door and on the porcelain-handled knife came from the victim. He testified further that he did not attempt to determine the source of blood on the inside doorknob to the patio door because he was able to visually identify fingerprint ridges and did not want to disturb those prints. He only identified this as human blood.

Max Jarrell, a special agent with the FBI, testified as a fingerprint expert. His testimony as to the prints found on the outside and inside doorknobs of the rear patio door indicated that one fingerprint and one palm print on the outside doorknob belonged to petitioner; and one palm print present on the inside doorknob belonged to petitioner.

**ANALYSIS**

At a post-conviction evidentiary hearing, the burden is on the petitioner to prove the allegations of fact entitling him to relief by clear and convincing evidence.[2] See Tenn. Code Ann. § 40-30-210(f) (1997). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App.), perm. app. denied (Tenn. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901, n.3 (Tenn. 1992)). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. See Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990).

## I. Variance

The petitioner argues that the prosecution developed a case throughout the trial of felony murder based on kidnapping, a fatal variance from the indicted offense of felony murder based on especially aggravated robbery and theft of property.[3] This course of action, according to the

_____

[2]Because this petition was filed on May 10, 1996, it is governed by the provisions of the 1995 Post-Conviction Procedure Act, which applies to all petitions filed after May 10, 1995. See Tenn. Code Ann. § 40-30-210, Compiler's Notes (1997).

[3]The indictment for first degree murder stated the following:

> THE GRAND JURORS for the State aforesaid, being duly summoned, elected, impaneled, sworn and charged to inquire for the body of the County aforesaid, upon their oaths present:
> That Ronald Bradford Waller heretofore on January 10, 1991, in the County aforesaid, did unlawfully, intentionally, deliberately and with premeditation kill Howard C. Jewell, in violation of Tennessee Code Annotated 39-3-202, against the peace and dignity of the State.
> SECOND COUNT:
> THE GRAND JURORS for the State aforesaid, being duly summoned, elected, impaneled, sworn and charged to inquire for the body of the County aforesaid, upon their oaths further present:
> That Ronald Bradford Waller heretofore on January 10, 1991, in the County aforesaid, did unlawfully and recklessly kill Howard C. Jewell during the perpetration of Especially Aggravated Robbery, Especially Aggravated Burglary and Theft of Property, in violation of Tennessee Code Annotated 39-13-202, against the peace and dignity of the State.

The applicable version of § 39-13- 202 stated:

(continued...)

-7-

petitioner, resulted in a fatal variance and a violation of petitioner's constitutional rights.[4] The State contends that the prosecution merely described the preamble to the crimes and that, since the petitioner was convicted of premeditated and deliberate murder as well as felony murder, the alleged variance did not affect the petitioner's substantial rights.

Additionally, the State argues that this issue has been waived because the petitioner could have raised it on direct appeal and did not do so. See Tenn. Code Ann. § 40-30-206(g). On the other hand, the post-conviction court, following remand from this court for findings of fact and conclusions of law, concluded that this issue of fatal variance between proof and pleadings was predetermined on direct appeal. See Tenn. Code Ann. § 40-30-206(h).

The record indicates that this issue was not addressed on direct appeal, so it is not subject to waiver as predetermined. The issue was raised in petitioner's original post-conviction relief petition in which he argued that defense counsel was ineffective for failing, among other shortcomings, to raise the issue on direct appeal after the petitioner said that he wanted the issue raised. We conclude that the issue has not been waived for failure to raise it on direct appeal and will consider petitioner's variance issue on the merits.

---

[3](...continued)
**First Degree murder.**— (a) First degree murder is:

    (1)  An intentional, premeditated and deliberate killing of another; or

    (2)  A reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy; or

    (3)  A reckless killing of another committed as the result of the unlawful throwing, placing or discharging of a destructive device or bomb.

    (b)  A person convicted of first degree murder shall be punished by death or imprisonment for life.

The State dismissed pretrial the charge of especially aggravated burglary.

[4]Petitioner claims a violation of his rights under "Article I, §§ 4, 6, 8, 9, and 10 of the Constitution of Tennessee, and the Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States." Article I, Section 4 of the Constitution of Tennessee states that no political or religious test shall be required as qualification to any office or public trust under this State; therefore, this basis for constitutional violation is not applicable in the petitioner's case.

A variance arises when the proof presented at trial departs from the allegations in the indictment. State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App.), perm. app. denied, (Tenn. 1994). The most often cited analysis of the law governing variances is found in Berger v. United States, 295 U.S. 78, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). The Berger Court stated:

> The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense.

Id. at 82, 55 S. Ct. at 630 (citations omitted). The general rule, nevertheless, is not to be applied so rigidly that the mere finding of error presumes prejudice. The Court noted that "if, upon an examination of the entire record, substantial prejudice does not appear, the error must be regarded as harmless." Id. at 82, 55 S. Ct. at 631. The Court held that, in the circumstances of the case at bar, "the variance was not prejudicial and hence not fatal." Id. at 84, 55 S. Ct. at 631.

Our supreme court set out the policy on variance to be followed in this state in State v. Moss, 662 S.W.2d 590 (Tenn. 1984). This test, like the test in Berger, looks to the substance of the variance rather than to any rigid rules of form. The Moss court stated:

> The policy now followed in this and in most other jurisdictions is that before a variance will be held to be fatal it must be deemed to be **material** and **prejudicial**. A variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.

Id. at 592 (emphasis added).

Our supreme court applied this two-prong test of whether a variance is material and prejudicial in State v. Mayes, 854 S.W.2d 638 (Tenn. 1993). In that case, the defendant was convicted of selling a controlled substance. The issue before the court was whether the variance between the named buyer in the indictment and the buyer identified through proof at trial was fatal. The court determined first that the variance was not material because the indictment and proof substantially corresponded. See id. at 640 (citing Berger, 295 U.S. at 82-84, 55 S. Ct. at 631). The indictment and proof depart and a material variance occurs "only if the prosecutor has attempted to rely at the trial upon theories and evidence that were not fairly embraced in the allegations made in the indictment." Id. (citing Russell v. United States, 369 U.S. 749, 763, 82 S. Ct. 1038, 1046-47, 8 L. Ed. 2d 240 (1962)). The Mayes court concluded that the identity of the buyer was not an

element which was alleged in the indictment or proven at trial to support a conviction under the drug statute, and the variance was, therefore, not material. See id. at 642.

The Mayes court also determined that the defendant had suffered no prejudice from being misled or deprived of his right to be protected against further prosecution for the same offense. Misleading the defendant occurs if the indictment does not sufficiently inform the defendant of the charges against him so that he may prepare his defense. See Moss, 662 S.W.2d at 592. The court concluded that the identity of the actual purchaser of the drug served only to describe the offense charged and formed no part of its required substance. The indictment "correctly identified the Defendant, the crime alleged, the type of drug sold, and the date and place of the sale. The Defendant knew he was defending the charge of an unlawful sale under T.C.A. § 39-6-417(a) of a specified drug at the time and place in question." Id. As to the issue of double jeopardy, our supreme court concluded that the defendant "can rely upon the entire record in the event that future proceedings are taken against him for the same offense. The record leaves no doubt that the Defendant has been once placed in jeopardy for the sale of the drug at the time and place set forth in the indictment." Id.

Based on these legal authorities, we review petitioner's charge of fatal variance under the two-prong test of Moss as follows:

      (1) Is the variance material?

          (a) Do the allegations in the indictment and proof fail to substantially correspond?

          (b) Did the prosecutor rely at the trial upon theories and evidence that were not fairly embraced in the allegations in the indictment?

      (2) Is the variance prejudicial to the defendant's substantial rights?

          (a) Is the variance such as to mislead the defendant by failing to sufficiently inform the defendant of the charges levied against him so that he cannot adequately prepare for trial?

          (b) Is the variance such that the defendant is left unprotected from subsequent prosecution on grounds of double jeopardy?

First, we set out the specific statements made during the course of his trial, which petitioner argues, together, constitute fatal variance of the felony murder charge:

      (1) In his opening remarks, the prosecutor presented the following theory of the case:

-10-

What happened on that night is that Mr. Waller, an opportunist, a drifter, found an easy mark in Mr. Jewell. After he got him to the Quality Inn he attempted to rob him. He learned that Mr. Jewell lived here in Chattanooga at the Beaver Creek Apartments. He determined that he could possibly obtain more money by going to the Beaver Creek Apartments. He took Mr. Jewell there. He killed him there. He stole his property there. He went through Mr. Jewell's things there. He took Mr. Jewell's car. He fled this jurisdiction. He hid from the police and was finally caught in Florida.

(2) Following the admission of the victim's briefcase as evidence, the prosecution questioned Detective Tim Carroll of the Chattanooga Police Department, who was the homicide investigator for this case, concerning the contents of the victim's briefcase, which the petitioner testified had been in the victim's possession at the Quality Inn and taken back to the victim's apartment:

Q. Inside the briefcase, just tell the jury what kind of items that you found.

A. Got a glasses case contains some glasses.

Q. Let me ask you. Did you find a wallet?

A. Yes.

Q. Did you find items that normally go in a wallet?

A. Yes, they were outside of the wallet.

Q. What kind of items are those?

A. Social security cards, apparently some phone numbers on plastic cards, business cards. Some kind of card entry.

Q. A parking card – I mean [a] gate card?

A. Yes, that would be it. Another glass holder, pocket holder. Four audio cassettes, music tapes, a book of matches, comb, pack of Lucky Strikes. Looks like family photographs of a child. Sunglasses, empty or torn Camel pack.

Q. Torn Camel pack?

A. Yes, sir. Dupont Credit Union card.

Q. Did you also find Mr. Jewell's driver's license?

A. Yes, I did.

Later, while cross-examining the petitioner, the prosecutor asked the following question:

Q. If perhaps you had seen Mr. Jewell's driver's license while you were at the Quality Inn and if perhaps you had seen the address of Mr. Jewell which was Beaver Creek apartments, would that have been anything to you?

(3) During closing argument, Assistant District Attorney Stern argued as follows:

So you will have the option of deciding based on the facts whether either of these two first degree or you'll be able to choose what you believe happened in this case, whether it was an intentional, premeditated and deliberate killing of another or was a reckless killing committed in the perpetration of, and in this case, robbery and kidnapping. Now, I believe that the facts in this case and the facts that you heard during this and all of the evidence that have come in, could support either of these.

. . . .

I think that really, ladies and gentlemen, that all of this evidence in this case shows you that at some point the defendant intended to lure Mr. Jewell back to his apartment. He probably somehow found out that he lived in the Chattanooga area. Perhaps he looked at his wallet, perhaps he was going to rob Mr. Jewell. Pulls out his billfold to rob him or when he pulls out his billfold to rob him, he sees he lives at Beaver Creek Apartments. And he thinks, whoa. I know where Beaver Creek Apartments is, I'm from the Hixson area, I'm from the Chattanooga area, we're going for a ride. He makes Mr. Jewell get in the car, he forces Mr. Jewell at gunpoint to the Beaver Creek Apartments. He forces Mr. Jewell into the house.

Petitioner also cites additional statements from closing arguments of the prosecutor including "[W]hat really happened in this case is the defendant was robbing or intending to rob Mr. Jewell, force him to his home;" and "[Appellant] forced him to his home when he found out where he lived;" and "He took Mr. Jewell to his apartment, that's obvious;" and "There was a traveling from one point to the other at gunpoint, he had the gun."

While we agree with petitioner that the prosecutor misspoke when she said that the jurors would be able to choose whether the felony murder charge was committed in the perpetration of

robbery and kidnapping rather than robbery and theft, this does not amount to a material variance between the charges and the proof at trial. The prosecution clearly did not rely on a kidnapping theory to build its case of felony murder in the perpetration of robbery and theft. The contents of the victim's briefcase were appropriately in evidence, and the State appropriately questioned the petitioner concerning the possibility that he gained valuable information about the victim from seeing the victim's driver's license. How that information might have been used was not critical to the State's case. In fact, in the quotations the from closing argument selected by the petitioner, the State argued alternatively that the petitioner "lured" the victim back to the Beaver Creek Apartments and that he "forced" him back. Additionally, during closing argument, the prosecutor stated:

> Now, the defense of course wants you to assume this is for homosexual activity. That may be an inference you can draw. But I don't think there's anybody who's come in and testified exactly what happened. So you can use your common sense, you can make a decision about that but what we really know is that somehow they came together and they checked into this motel and then they went around the corner and no one saw them after that until they got somehow to the Beaver Creek Apartments. . .[.]

Our supreme court has stated: "The purpose of summation is to allow each side 'to assist the jury in analyzing, evaluating, and applying the evidence' and it 'includes counsel's right to state his contention as to the conclusion that the jury should draw from the evidence.'" State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997) (quoting United States v. Garza, 608 F.2d 659, 662 (5th Cir. 1979)). Closing argument is a privilege afforded to the State and the defense, and courts have generally permitted wide latitude to counsel in arguing their cases to the jury. See State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Defense, in closing, noted that there were no witnesses to the petitioner and victim's departure from the motel. Defense also characterized the prosecutor's closing argument to the jury in the following way:

> [I]f Ms. Stern were the Judge, she would give you two options in this case. You can either find him guilty of premeditated murder or you can find him guilty of what's commonly called felony murder or murder in the perpetration of a different crime. . . . But there is the one option she forgot to mention to you, another option, and that is you don't have to find [him] guilty of either one of those.

How the appellant and the victim got to the Beaver Creek Apartments was a question placed in controversy. Each side argued its theory. But, kidnapping was not an element of the charged offense of felony murder in the perpetration of robbery, and theft and was not legally essential to the charge. Furthermore, the State did not rely on a theory of kidnapping to any significant degree during the presentation of its case. We conclude that no material variance occurred.

As to the second prong of the Moss test, the petitioner has failed to show that his substantial rights have been prejudiced. The indictment, set out in footnote three, clearly put the petitioner on

-13-

notice that he would be called upon to defend himself on the charge of felony murder based on robbery and theft and the petitioner was therefore able to prepare a defense without any surprise at trial. See State v. Clabo, 905 S.W.2d 197 (Tenn. Crim. App.), perm. app. denied (Tenn. 1995) (concluding that where defendant knew of time period under scrutiny when the State proceeded on theory that acts of sexual abuse occurred on February 20 and the young victims recalled that the acts took place around Valentine's Day, defendant was not surprised and was able to prepare an adequate defense). Here, the petitioner was not misled such that he was not able to adequately prepare his defense. The petitioner fully presented his defense, claiming to have been the one kidnapped, who then killed in self-defense. It was the jury's prerogative to disbelieve him.

The petitioner is also protected from being placed twice in jeopardy for the same offense. It is well settled that jeopardy attaches when the accused is put on trial before a court of competent jurisdiction, upon an indictment sufficient in form and substance to sustain a conviction and the jury has been impaneled and sworn. See Etter v. State, 205 S.W.2d 1, 3 (Tenn. 1947). The record shows that the petitioner has been placed in jeopardy on the theory of felony murder. Mandatory joinder requires the prosecuting official to join offenses based on the same criminal episode if "such offenses are known to the appropriate prosecuting official at the time of the return of the indictment . . . and if they are within the jurisdiction of a single court." Tenn. R. Crim. P. 8(a). Accordingly, charges based on the same criminal episode are " barred from future prosecution if known to the appropriate prosecuting official at the time that the other prosecution is commenced, but deliberately not presented to a grand jury." Id., Advisory Commission Comments. The petitioner, therefore, would be protected from re-prosecution for felony murder of Howard Jewell.

We conclude that no material or prejudicial variance occurred, but, even if the prosecutor's inadvertent misstatement during closing statement could be construed as material and prejudicial variance in that her statement referred to robbery and kidnapping as the underlying felonies instead of robbery and theft, it would be harmless error beyond a reasonable doubt. See State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). The weight of proof in this case has already been determined by this court to be legally sufficient to convict the petitioner of first degree premeditated and deliberate murder as well as felony murder based on the underlying felonies of robbery and theft. See State v. Ronald B. Waller, No. 03C01-9212-CR-00429, 1993 WL 398452 (Tenn. Crim. App., Knoxville, Oct. 6, 1993), perm. app. denied (Tenn. Feb. 7, 1994); see also State v. Adams, 859 S.W.2d 359, 363 (Tenn. Crim. App. 1992), perm. app. denied (Tenn. 1993) (concluding that improper consolidation, although error, did not require a new trial because the evidence of guilt adduced against defendant was abundant and legally sufficient). Considering the record as a whole, any error in closing argument of the prosecutor "more probably than not" did not affect the result of this case. See Tenn. R. App. P. 36(b); see also Chapman v. California, 386 U.S. 18, 22, 87 S. Ct. 824, 827, 17 L. Ed. 2d 705 (1967).

Petitioner argues alternatively that the statements of the prosecution at trial, which we set out above, have, in effect, so altered the charging terms of the indictment that a constructive amendment of the indictment has occurred that is prejudicial per se and precludes application of the harmless error rule. See Stirone v. United States, 361 U.S. 212, 217, 80 S. Ct. 270, 273, 4 L. Ed. 2d 252 (1960) (stating that "a court cannot permit a defendant to be tried on charges that are not made in the

indictment against him").[5]   Petitioner relies on <u>Watson v. Jago</u>, 558 F.2d 330 (6th Cir. 1977), to support his argument of constructive amendment.  But in <u>Jago</u>, unlike this case, the defendant was forced to defend against a charge of felony murder, which was not contained in the indictment at all. <u>Id</u>. at 331.  The prosecutor argued in <u>Jago</u> that "premeditated murder and felony-murder were both first degree murder and that the indictment, by charging first degree murder, did not have to include a statement that the indictment was for felony-murder for a defendant to be prosecuted on that charge."  <u>Id</u>. at 332.  The Sixth Circuit Court of Appeals held that "[t]o allow the prosecution to amend the indictment at trial so as to enable the prosecution to seek a conviction on a charge not brought by the grand jury unquestionably constituted a denial of due process by not giving appellant fair notice of criminal charges to be brought against him."  <u>Id</u>. at 339.  No such amendment occurred here.

Continuing his contention that a constructive amendment occurred, petitioner additionally argues that, although the trial court properly instructed the jury as to felony murder based solely on robbery and theft,[6] the arguments of the State opened up a new charge of felony murder based on kidnapping, and the trial court failed to instruct the jury concerning the weight to be given such statements of counsel. We disagree.  Prior to closing statements, the trial court instructed as follows:

> At this time the attorneys have an opportunity to make their closing statements to you.  Their statements are typically what the attorneys recall that the evidence is or was or what reasonable inferences and conclusions they would have you draw from that evidence.  You are the judges of the evidence.  If for any reason, inadvertent or otherwise, there should be any difference or discrepancy between the statements of the attorneys and the evidence itself, you must in all events rely on the evidence itself.

This instruction was in addition to one made by the trial court at the beginning of the trial when it stated to the jury, "All right, as I indicated to you earlier, the statements of attorneys are not the same as evidence.  You will rely on the evidence itself."

---

[5]Stirone was indicted and convicted in a federal court for unlawfully interfering with interstate commerce in violation of the Hobbs Act.  The defendant was charged specifically with interference of interstate importation of sand. In reversing the conviction, the Supreme Court held that "when only one particular kind of commerce is charged to have been burdened a conviction must rest on that charge."  <u>Id</u>. at 218.  In <u>Stirone</u>, the government was permitted, over objection of the defense, to offer evidence of an interference with steel shipments, and the trial court charged the jury based on this evidence.  Here, the State offered no proof of kidnapping, and the trial court did not instruct as to that offense.

[6]We presume that jurors follow the instructions of the trial court. <u>See</u> <u>State v. Cribbs</u>, 967 S.W.2d 773, 784 (Tenn. 1998).

Having determined that neither a fatal variance nor constructive amendment occurred in this case, we conclude that this issue is without merit.

## II. Re-Enactment Demonstration

Petitioner asserts that his constitutional rights were violated when the State, during cross-examination of the petitioner, compelled the petitioner to step down to the courtroom floor to demonstrate how he pushed the victim, with the prosecutor taking the role of the victim. Although he never actually touched the prosecutor, the petitioner argues that he was denied a fair trial in that he was asked to perform physical acts that unjustly or improperly prejudiced him. The State contends that the request for demonstration on cross-examination, based on petitioner's testimony, was proper. The post-conviction court found that it was proper cross-examination for the prosecutor to ask petitioner to physically demonstrate his version of the crime.

Once the petitioner voluntarily chose to take the witness stand, he waived his right against self-incrimination and became subject to rigorous cross-examination. See Brown v. United States, 356 U.S. 148, 154-56, 78 S. Ct. 622, 2 L. Ed. 2d 589 (1958); Gray v. State, 250 S.W.2d 86, 92 (Tenn. 1952) ("It is well settled that when a defendant takes the witness stand in his own behalf he is subject to the same methods of cross-examination as an ordinary witness."); Bass v. State, 231 S.W.2d 707, 713 (Tenn. 1950) (stating that when a defendant takes the stand, "all question concerning his right to protect himself against compulsory inculpation in connection with the crime under investigation is waived"); Brooks v. State, 213 S.W.2d 7, 10 (Tenn. 1948) (concluding that when a defendant elects to testify, "he subjects himself to all the rules and tests of credibility, and may be impeached in the same manner as any other witness").

The majority of jurisdictions in this country hold that when a defendant voluntarily becomes a witness, he may also be properly required to participate in specific physical acts or exhibitions if relevant to the case.[7] Nevertheless, when a criminal defendant chooses to testify, he is still guaranteed a fair and impartial trial according to both the Sixth Amendment of the U.S. Constitution and Article I, Section 9 of the Constitution of the State of Tennessee. A defendant who has taken the witness stand should not be compelled to perform acts which will improperly prejudice him and thus, as petitioner claims here, deprive him of a fair trial. The Sixth Circuit Court of Appeals has concluded that "a criminal defendant's right to a fair trial may be violated if, after taking the stand, he is forced to perform acts which would unjustly prejudice him." United States v. Doremus, 414 F.2d 252, 253-54 (6th Cir. 1969) (citing State v. Taylor, 407 P.2d 59, 64 (Ariz. 1965) (holding that defendant was not humiliated or disgraced by being required to try on hat as means of impeaching prior testimony of defendant that hat did not belong to him). A defendant would be unjustly

---

[7]See, e.g., United States v. Doremus, 414 F.2d 252, 253-54 (6th Cir. 1969); Ziegler v. United States, 174 F.2d 439 (9th Cir. 1949); Neely v. United States, 2 F.2d 849 (4th Cir. 1924); State v. Taylor, 407 P.2d 59 (Ariz. 1965); Coats v. State, 45 So.2d 35 (Ala. 1950); Fox v. Commonwealth, 185 S.W.2d 394 (Ky. 1945); State v. Jones, 62 P.2d 44 (Wash. 1936); State v. Heavener, 143 S.E. 674 (S.C. 1928); State v. Oschoa, 242 P. 582 (Nev. 1926).

prejudiced where "the requested performance or demonstration would unjustly humiliate or degrade the defendant or in a case in which such performance would be damaging to the defendant's image and irrelevant to the issue on trial." Doremus, 414 F.2d at 254 (citing State v. Thorne, 117 P. 58, 67 (Utah 1911)).

In this case, the petitioner voluntarily chose to become a witness in his own behalf and thereby waived his privilege against self-incrimination. Having done so, he "must respond to all inquiries pertinent to the issue on trial." Id. at 253. Petitioner's offer of personal testimony, deemed by him competent and material to the issue of self-defense, left him open to be cross-examined as to any matter material to the case.[8]

The petitioner had testified on direct examination that the victim had produced a pistol, pointed it at the petitioner, and, utilizing the weapon, forced the petitioner to accompany him to the victim's apartment. After they entered the apartment, he said that the victim, still with the pistol, told him to get undressed. The petitioner said that as his pants were halfway to his knees, he pulled out his pocketknife and raised up quickly. He opened the knife and knocked the pistol out of the victim's hands. As he then advanced, holding the knife, toward the victim, the victim grabbed the petitioner's hand, folding the blade onto the victim's finger and cutting it. Subsequently, during cross-examination, the petitioner was questioned in detail about this confrontation.

The demonstration that petitioner alleges was unfairly prejudicial to him occurred during cross-examination concerning the petitioner's explanation of what transpired as the petitioner and the victim were inside the victim's apartment, and the victim held a gun on the petitioner:

> Q. So then you get in the apartment and he again says I just want someone to talk to and then does he change his demeanor or something and say take your clothes off?
>
> A. He told me I needed to get undressed.
>
> Q. All right, you need to get undressed. Was he undressed?
>
> A. No, sir.
>
> Q. Okay. Where were you standing when he tells you that you need to get undressed?
>
> A. In front of him -- I don't know, the set up of this -- he was between me and the door, I remember that.

---

[8]See, e.g., Long v. State, 607 S.W.2d 482, 485 (Tenn. Crim. App. 1980) ("Cross-examination is not limited in Tennessee to subject matter dealt with on direct examination, but rather it extends to any matters material to the lawsuit.")

Q. You do what, get undressed?

A. No, sir.

Q. Pull your pants down or something, is that what you testified to?

A. Partially to my knees.

Q. And then what, you reach into your pocket?

A. Yes, sir.

Q. If you would, could you just step down and demonstrate if you will, how close, you know, were you to each other when you were doing this, sort of demonstrate to the jury –

MR. COX: Your Honor, if I could have this cleared again. It's not loaded. I'm going to be Mr. Jewell.

Q. Now, was it cocked?

A. Not to my knowledge.

Q. Were you looking at it through, I mean you were this close to it, weren't you?

A. I was pretty close.

Q. Now, was he holding it like that?

A. Yes, sir.

Q. He says get undressed. Now what did you do?

A. I pulled my pants down halfway to my knees. I slipped my hand in my pocket, pulled my knife out and I come up and knocked it out of his hand.

Q. Well, you're going to have to come this way.

A. Knocked it out of his hands. I'm now sure which way, it fell to the floor.

-18-

Q. You knocked it with your right hand?

A. Yes, sir.

Q. With the same hand that you had a knife in?

A. I believe.

Q. Then what did you do?

A. I pushed him back.

Q. How did you push him, just demonstrate on me what you did.

A. I can't remember exactly.

Q. Well, try.

A. Well, I can't. I'm sorry.

After the petitioner's refusal to demonstrate by pushing the prosecutor, defense counsel objected, and a bench conference was held out of the hearing of the jury:

> MR. HILL: He's trying to get Mr. Waller to assault him and that's just inappropriate.
>
> MR. COX: Judge, I'm trying to get him to demonstrate what happened, that's all. As the Court can see, he's been totally uncooperative.
>
> MR. HILL: He's cooperated as he possibly can.
>
> MR. COX: The jury can decide that.
>
> MR. HILL: Mr. Cox wants him to apparently physically assault Mr. Cox so as to inflame the jury a little more I guess, I don't know.
>
> THE COURT: No, he's not going to assault. He can demonstrate or show. I think it's in line, the demonstration is all right.

The record shows that the petitioner continued to voice strong objection to participating in the demonstration, and the prosecutor moved on to another area of questioning. However, the petitioner contends that by allowing the prosecutor to ask petitioner to participate in such a demonstration, the trial court committed prejudicial error.

-19-

The petitioner also complains of a second "demonstration" which, in fact, was simply cross-examination as to how he opened the knife while the victim was pointing a pistol at him:

Q. Did you open it with one hand or did you open it with two hands?

A. I believe two hands.

Q. Like this?

A. I was bent over him.

Q. Like this? You could demonstrate.

A. I don't recall if I opened it with one hand or two hands, okay?

Q. Can you open it with one hand?

A. It can be done.

Q. Can you do it?

A. It's been a long time.

Q. Well, has it been before January the 9th, 1991?

A. I guess if you don't do it, it's not that easy to do.

Q. No, it doesn't appear to be that easy. It's not that easy for me to do.

A. It's something –

Q. Huh?

A. It takes practice.

Q. Had you been practicing?

A. It's like cutting a deck of cards with one hand. Can you do that?

Q. I'll tell you what let's do. I'll ask the questions and you answer them if you can. Did you open it with one hand or did

-20-

you open it with two?

A. To the best of –

MR. HILL: Your Honor, he's already testified, I think three or four times, he doesn't recall how he opened it.

THE COURT: We'll move along.

Q. I think he does recall. He said two hands, didn't he?

A. To the best of my knowledge.

Q. Now, did Mr. Jewell shoot you?

A. Do I appear to be shot?

Q. Did Mr. Jewell shoot you when you opened this knife with two hands.

A. No, sir, he didn't.

It is well within the trial court's discretion to permit a physical demonstration in the courtroom. See State v. Underwood, 669 S.W.2d 700, 704 (Tenn. Crim. App. 1984). Demonstrative evidence is admissible only if relevant under Tennessee Rule of Evidence 401. Demonstrative evidence is presented to assist the trier of fact in understanding and evaluating the other evidence offered at trial. See Cohen, Sheppeard, and Paine, Tennessee Law of Evidence, § 401.10 (3d ed. 1995). Demonstrative evidence is most often attacked, as petitioner does here, on grounds that it is too prejudicial under Rule 403. See id. For evidence to be excluded on the grounds of prejudice, its probative value must be substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403.

An in-court, re-enactment demonstration has been challenged and found appropriate evidence in a number of jurisdictions. In State v. Thornton, 498 N.W.2d 670 (Iowa 1993), the defendant was accused of first degree murder and claimed self-defense. On cross-examination, the prosecutor asked the defendant to step down and show the jury how the "whole incident happened," with the prosecutor acting as the victim. Id. at 674. The defendant resisted the demonstration, claiming that it "occurred so quickly he could not remember exactly how it happened." Id. Over defense's objection, the trial court allowed the demonstration. The prosecutor asked the defendant specifics, such as where the victim was standing in relation to the defendant; in which hand the victim held the knife; and where the victim's hand and the knife where when the defendant fired the gun. The defendant answered that he could not remember or did not know. The trial court ordered the defendant to sit down, and the prosecutor continued with cross-examination. Id. The Iowa Supreme Court concluded that the trial court did not abuse its discretion in allowing the demonstration. Since

the entire case turned on the defendant's claim of self-defense, the actions of the defendant and the victim during the confrontation were vitally important to both the defense and the state's case. Additionally, the demonstration bore upon the defendant's credibility. Id. at 674-75.

In Sipress v. State, 562 N.E.2d 758, 763 (Ind. 1990), the defendant, having testified, was appropriately compelled to demonstrate how he spilled a scalding kettle of water onto his three-month-old daughter. The fact that the defendant was unwilling to participate or uncertain as to what happened went to his credibility as a witness. Id. at 763. In Price v. State, 570 A.2d 887 (Md. 1990), the defendant, having testified that he shot and killed both his wife and her fifteen-year-old daughter, argued that he was unfairly prejudiced when the trial court allowed an in-court demonstration in which the defendant was compelled to hold the gun as he did during the shootings. Defendant claimed to have been in a "dream-like state" before getting the gun; therefore, the defendant's ability to recall how he held the gun was relevant. The trial court did not abuse its discretion in ordering the defendant to demonstrate how he held the rifle. Id. at 894. In State v. Gil, 543 A.2d 1296 (R.I. 1988), during cross-examination, the defendant was required to "step down from the witness stand, take hold of his gun, and demonstrate how the shooting had occurred," with the prosecutor playing the part of the victim. Id. at 1299. The prosecutor asked the defendant to show how he removed the gun from his car when the victim approached him; and how he held the gun when he fired the warning shots. The defendant responded that he did not remember. Defendant argued on appeal that he was improperly prejudiced by being forced to continue the demonstration over his repeated claims of lack of memory. The issue in Gil was the defendant's claim of self-defense; therefore, "the sequence of events surrounding the shooting was of extreme importance." Id. at 1300. The trial court did not abuse its discretion in allowing the demonstration.

Here, the prosecution sought to discredit the petitioner's assertion that he killed the victim in self-defense to fend off a homosexual attack. In order to be relevant, "evidence must tend to prove a material issue." Tenn. R. Evid. 401, Advisory Commission Comments. A demonstration that would show the sequence of events that led to the victim's death was relevant under Rule 401. Although the petitioner never touched the prosecutor, petitioner contends that asking that he touch the prosecutor was unfairly prejudicial to him because he was faced with an unfair dilemma: "Had the Appellant exhorted [sic] force on the District Attorney, such display would have been inherently suggestive thereby arousing the feelings of horror and indignation in the jury. However, and because the appellant refused, the State was able to effectively argue an inference of guilt on those [sic] basis." Petitioner describes this as a "foul blow" on the part of the prosecutor. We disagree. Once the petitioner had become a witness and thereby waived the shelter of constitutional protection against self-incrimination, he could not choose only to give testimony favorable to him; he was obliged to answer all pertinent inquiry. We cannot say that the probative value of demonstrations as to how the petitioner defended himself or opened the knife were substantially outweighed by the danger of prejudice to him. This issue has no merit.

### III. Ineffective Assistance of Counsel

Petitioner argues that he received ineffective assistance of counsel during trial and on direct appeal. The State asserts that, regardless of the list of alleged instances of defective performance

by defense counsel, petitioner has not shown by a preponderance of the evidence that, were it not for these errors, the result of the trial would have been different. The State points to the overwhelming evidence of the petitioner's guilt. The post-conviction court found that the "services rendered by trial counsel were within the range of competence demanded of attorneys in criminal cases." During the January 27, 1997, continued hearing on this post-conviction petition, the post-conviction court stated:

> Hank Hill is a very able trial lawyer. Whether he likes the defendant or not doesn't make any difference. Mr. Hill wants to win. Mr. Hill does everything he can to win a case. In fact, Mr. Hill will skirt as close to the line as he can in the defense of any defendant, which he's supposed to do. He doesn't get over the line but he goes right up to it, because he uses all of his knowledge, training and experience to seek the acquittal of his client.

The post-conviction court also concluded that, even if services of counsel were beneath this range, petitioner failed to show how the outcome would have been different given the overwhelming proof of petitioner's guilt.

In order to determine the competence of counsel, Tennessee courts have applied standards developed in federal case law. See State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997), perm. app. denied (Tenn. 1998) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The U.S. Supreme Court articulated the standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which is widely accepted as the appropriate standard for all claims of a convicted petitioner that counsel's assistance was defective. The standard is firmly grounded in the belief that counsel plays a role that is "critical to the ability of the adversarial system to produce just results." Id. at 685, 104 S. Ct. at 2063. The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable.

Id. at 687, 104 S. Ct. at 2064. The Strickland Court further explained the meaning of "deficient performance" in the first prong of the test in the following way:

> In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. . . . No particular set of detailed

-23-

rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

Id. at 688-89, 104 S. Ct. at 2065. Petitioner must therefore, establish that "the advice given or the service rendered was not within the range of competence demanded of attorneys in criminal cases[.]" Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

As for the prejudice prong of the test, the Strickland Court stated: "The petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S. Ct. at 2068; see also Overton v. State, 874 S.W.2d 6, 11 (Tenn. Crim. App. 1995) (holding that petitioner failed to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different").

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the petitioner makes an insufficient showing on one." Id. at 697, 104 S. Ct. at 2069; see also Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

By statute in Tennessee, the petitioner at a post-conviction relief hearing has the burden of proving the allegations of fact by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f) (1997). A petition based on ineffective assistance of counsel is a single ground for relief, therefore all factual allegations must be presented in one claim. See Tenn. Code Ann. § 40-30-206(d) (1997).

We note that when post-conviction proceedings have included a full evidentiary hearing, as was true in this case, the trial judge's findings of fact and conclusions of law are given the effect and weight of a jury verdict, and this court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990). The reviewing court must indulge a strong presumption that the conduct of counsel falls withing the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. See Thompson v. State, 958 S.W.2d 156, 165 (Tenn. Crim. App.), perm. app. denied (Tenn.1997).

Finally, a person charged with a criminal offense is not entitled to perfect representation. See

<u>Denton v. State</u>, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996), <u>perm</u>. <u>app</u>. <u>denied</u> (Tenn. 1997).[9] This court has noted that "[i]n order to pass constitutional muster, counsel need not discover every possible item of information before trial, make every possible objection during trial, or use every trial tactic which petitioner would, in retrospect, now require." <u>Allen v. State</u>, No. 960, 1991 WL 154520, at *2 (Tenn. Crim. App., Knoxville, Aug. 14, 1991), <u>perm</u>. <u>app</u>. <u>denied</u> (Tenn. Jan. 6, 1992).

The petitioner alleges some forty-six instances of ineffective assistance of counsel in his original petition for post-conviction relief. Some of these are restated and elaborated on in his present appeal. We have painstakingly reviewed each factual allegation, as well as the June 4, 1999, Findings of Fact and Conclusions of Law submitted by the post-conviction court on remand from this court. We note that this court should not examine every allegedly deficient act or omission in isolation, but rather in the context of the case as a whole. <u>See</u> <u>State v. Mitchell</u>, 753 S.W.2d 148, 149 (Tenn. Crim. App.), <u>perm</u>. <u>app</u>. <u>denied</u> (Tenn. 1988). The primary concern of the court should be the fundamental fairness of the challenged proceeding. <u>See</u> <u>id</u>. In an effort to thoroughly address each of his allegations, we have organized them into general categories of alleged offenses, and, with the principles outlined above to guide us, we proceed next to address petitioner's claim of ineffective assistance of counsel.

## A. Lawyer-Client Relationship

Petitioner asserts that counsel should have withdrawn because of the failure of their lawyer-client relationship. Specifically, petitioner points to counsel's alleged failure to contact petitioner prior to trial, personal conflicts between the parties, and counsel's excessive workload. Petitioner claims that counsel failed to respond to his calls, and when counsel did respond he was abusive, "cussing out" the petitioner and hanging up on him. This led to what petitioner characterizes as "major differences" between him and his appointed counsel.

Counsel testified at the post-conviction hearing that he never refused to consult with petitioner and never "cussed him out." Counsel noted that petitioner was difficult to work with, but counsel also testified that petitioner always wanted him back on the case "once he realized what his options were."[10] The post-conviction court also stated that, "just from firsthand knowledge obtained

_____

[9]At his post-conviction hearing, petitioner stated that, had he been able to keep co-counsel appointed to his case at the time the death penalty was being sought, "[t]hey knowed I would have walked out that front door with Leroy Phillips if he'd walked in that courtroom with me." This may be the standard petitioner wishes to apply in measuring the effectiveness of counsel—walking "out that front door"—, but it is not the standard compelled by the Constitution.

[10]Counsel filed a motion to withdraw with this court prior to direct appeal based on "an intolerable situation," which we denied, stating that "[a]lthough the relationship is unsatisfactory, the appellant is not entitled to the counsel of his choice. Moreover, it would be disadvantageous for new counsel, without the benefit of trying the case, to attempt to file a satisfactory brief by February

(continued...)

here today, I realize the difficulty any lawyer would have in representing Mr. Waller."[11] Petitioner also asserts that counsel was faced with an overwhelming workload and lack of experience, conditions which we assume caused the petitioner to lose faith in his counsel. The post-conviction court specifically noted defense counsel's skill and ability, and nothing in the record indicates that counsel was anything but fully prepared for trial. Further, petitioner admitted to the post-conviction court that he did not object to appointed counsel on the day his trial began. Although we agree with petitioner that his relationship with counsel was far from harmonious, petitioner has failed to show any instances where the lawyer-client relationship precluded his being effectively represented.

## B. Investigation and Preparation

Petitioner asserts that counsel failed to consult with him in time to locate witnesses helpful to his case. Petitioner points to two individuals whose testimony would have shown that the petitioner did in fact earn $150 working on a roofing job during the time he stayed in Cleveland before leaving for Florida. Petitioner claims that this testimony would have refuted the State's theory of robbery and theft. Petitioner also claims that counsel failed to locate witnesses in Florida whose testimony would have been helpful, although petitioner does not state in what way. Counsel testified at the post-conviction hearing to the following:

> A. Both I and the other -- and various investigators, specifically Allan Miller, talked to virtually everybody. Well, I did talk to everybody that testified at the trial. . . . I talked to everybody involved in the case; as a matter of fact, even drove down to Port St. Richey, Florida, to meet with Mr. Waller's mother and I believe sister; talked to the detectives down there who had - - he'd stolen Mr. Jewell's car after he killed him, and drove that car down to Florida where it was recovered at his mother's house. . . .
>
> Q. When you got to Florida, were there some witnesses that were missing by that time, some witnesses that you weren't able to find?

[10](...continued)
15."

[11]Counsel representing petitioner at the post-conviction hearing stated to the trial court that "he [petitioner] calls probably -- and he does this on my voice mail as well -- calls, like, every five minutes all day pretty much, you know, or at least for an hour at a time. He'll just continually call, and if I'm not there, the other attorneys won't accept the collect calls." We note that petitioner also sought to fire his post-conviction counsel, stating at the continued hearing on post-conviction relief that "[s]he's lied to me. I don't want her representing me. I can't trust her."

A. Not that I'm aware of. . . . The murder took place in Tennessee. The only issues in Florida were maybe for mitigation purposes or in an effort to perhaps suppress some of the evidence that was recovered down there.

The post-conviction court found that petitioner's testimony concerning the money he earned while in Cleveland was corroborated by the testimony of Carlena Stephenson, the friend with whom he stayed, and was not a disputed fact, making other testimony concerning the job cumulative. The post-conviction court further found that testimony of witnesses from Florida, for example, a man with whom petitioner had gone to a bar, was not helpful to his theory of self-defense. Petitioner also argues that the Coca Cola truck driver with whom the petitioner rode from the first Cleveland exit to where the victim picked him up should have been called to corroborate petitioner's testimony, lending him credibility, and to show that petitioner made "no attempts to rob him, or murder him." The post-conviction court found that testimony concerning the petitioner's ride before encountering the victim would not have added helpful information. We agree and conclude that counsel's decisions concerning these witnesses were within the range of competence demanded of attorneys in criminal cases.

Petitioner also argues that counsel failed to file a motion seeking a speedy trial, and that he failed to consult the petitioner before putting off the trial. Petitioner's trial began within approximately sixteen months of his indictment. The post-conviction court found that this period of time was not necessarily a denial of a speedy trial and stated the following:

> Even though today a case is supposed to be tried within one year, supposed to go to trial within six months, but also you have to remember that the State gave notice that they were seeking the death penalty. Death penalty cases are different from all other cases, and you have certain rights in a death penalty case that defendants do not have in any other cases. You were entitled to have two attorneys, you were entitled to have expert witnesses and all paid for at the expense of the State. Your attorneys have to spend more time preparing and it takes them longer to prepare.

Counsel testified that the case proceeded to trial as quickly as it was ready to be tried. To have gone to trial unprepared would have been unreasonable. Here, counsel acted within the range of competence required. The petitioner has utilized the phrase "speedy trial" to make a complaint against his trial counsel without even attempting to provide an appropriate analysis of the matter. State v. Bishop, 493 S.W.2d 81 (Tenn. 1973).

Petitioner further argues that counsel was ineffective in failing to investigate a relationship between the victim and Central Baptist Church, a church where the preacher and deacons, according to petitioner, had been convicted of child molestation. Testimony establishing this relationship, according to petitioner, would have supported petitioner's theory that the killing of the victim

happened while the petitioner was resisting a homosexual attack.[12] Such testimony would not have been relevant, and counsel acted reasonably and ethically in not knowingly seeking to introduce inadmissible evidence.

---

[12]Petitioner also asserts in his original petition for post-conviction relief that counsel failed to investigate petitioner's prior psychiatric treatment while in San Francisco. Petitioner alleges that this failure to investigate denied petitioner a defense, apparently of mental incompetence. Because at the continued hearing on his petition, petitioner stated that he did not want counsel to proceed with that theory and because this allegation is not included in the *pro se* brief filed with this court, we consider it waived. We note also that the record shows that petitioner underwent psychiatric evaluation at the Johnson Mental Health Center in Chattanooga prior to trial and was found competent to stand trial. Examining physicians also determined that a defense of insanity at the time of the offense could not be supported.

## C. Control and Direction of Litigation

Petitioner next asserts that counsel advised petitioner that he did not have any right not to take the stand, that he had to take the stand and testify. Counsel testified at the post-conviction hearing to the following:

> Mr. Waller was well aware of his rights to or to not take the stand. As a matter of fact, Donna Miller from the public defender's office spent two or three hours with him, I spent a couple hours with him explaining exactly what his options were. Mr. Waller was adamant that he wanted to testify, and Ms. Miller's role in that was to prepare him to testify.

The post-conviction court found petitioner's assertion in this regard to be unbelievable. We accept the determination in this regard of the post-conviction court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990).

## D. Trial Tactics

The majority of the allegations of ineffective assistance of counsel by petitioner fall within the broad category of trial tactics. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987). Petitioner points to each of the following as instances of ineffective assistance of counsel:

1. Failure to move for election of offenses;
2. Failure to dismiss a female juror;
3. Failure to request jury sequestration;
4. Failure to object to prosecution's opening statement;
5. Failure to object to the demonstration;
6. Failure to object to constructive amendment of indictment as to burglary, kidnapping, felony murder committed in perpetration of kidnapping, and tampering with and fabricating evidence;
7. Failure to object to mandatory rebuttable presumptions;
8. Failure to object to hearsay evidence of victim's doctor;
9. Failure to object to "crime scene" and "victim" language;
10. Failure to object to prosecutorial misconduct;
11. Failure to object to the testimony of Patrolman Longworth of the Port Richie Police Department and Dr. Allen, the victim's personal physician;
12. Failure to put on evidence of petitioner's good character;
13. Failure to impeach Dr. Allen, the victim's family physician;
14. Failure to call a security guard at the Quality Inn Motel as a witness and to call a Motel employee to testify concerning the

-29-

bathroom setup;

15. Failure to pursue defense of how victim would act without Prozac;

16. Failure to call an identity expert to discredit the testimony of Floyd Fuller;

17. Failure to challenge admission of photographs, video of crime scene, and charts of crime scene as unfairly prejudicial;

18. Failure to request that the trial court admonish the jury concerning statement by prosecutor that the victim's "head had been cut off" in a photograph of the victim's arms and hands; a statement by Dr. King that the victim's wound was a "finishing-off type"; and a statement by the prosecutor requesting that the testimony of Carlena Stephenson be struck.

19. Failure to challenge grand jury proceedings;

20. Failure to challenge "double jeopardy" where indictment was for both premeditated and felony murder;

21. Failure to cross-examine the victim's daughter concerning her testimony as to the value of the victim's car and concerning her opinion about why her father went to motels;

22. Failure to create reasonable doubt concerning the money and jewelry that petitioner left behind at the victim's apartment;

23. Failure to cross-examine the medical examiner concerning the possibility that some of the victim's wounds might have been caused by a fall or scraping against the rug;

24. Failure to call Robert Thompson, the roofing job employer; the Coca Cola truck driver, and the victim's psychiatrist;

25. Failure to pursue issue of whether petitioner should have been charged with one offense against property instead of two, i.e., robbery and theft of car;

26. Failure to point out to the jury what constituted reasonable doubt;

27. Failure to request instruction on proper use of prior convictions testimony and the nonevidentiary nature of attorneys' statements;

28. Failure to take the initiative and make a proper motion or directed acquittal on the basis that the overwhelming evidence was that the victim was the true perpetrator;

29. Acting as a third prosecutor by providing evidentiary links to the State's theory;

30. Bringing out petitioner's prior convictions on direct examination; and

31. Agreeing to stipulate that no Prozac was detected in the victim's body and then arguing the possible side effects of Prozac on the victim.

-30-

Petitioner also alleges instances of ineffective assistance of counsel during the direct appeal process:

32. Failure to appeal the admissibility of the letter to Carlena Stephenson written from Florida by the petitioner;
33. Failure to appeal the trial court's instructions on flight and reasonable doubt;
34. Failure to raise all issues on appeal that the defendant requested; and
35. Failure to raise cumulative error, cumulative reasonable doubt, and contamination of the scene on appeal.

As to item 1, election of offenses, that issue has been resolved adversely in this opinion to the petitioner. As to items 2 and 3, regarding complaints as to the jury, the post-conviction court found neither allegation rose to the level of ineffective assistance. We agree. As to item 4 regarding the prosecutor's opening statement, we deal with prosecutorial misconduct in Issue VI, but note here that we agree with trial counsel who testified that he did not think it improper for the state to outline its theory of the case in opening statements and there was nothing for counsel to object to. As to item 5 regarding the demonstration, we have dealt with that allegation in Issue II herein. As to item 6, we have dealt with that allegation in Issue I. In both cases, we found no error to which defense counsel could object.

As to item 7, the post-conviction court found no mandatory rebuttable presumptions to which defense counsel could object. We note that the constitutional mandate that the State prove every element of a crime beyond a reasonable doubt has been interpreted to mean that the State may not rely on an evidentiary presumption as a way to relieve it from this mandate. See e.g. Sandstrom v. Montana, 442 U.S. 510, 520-24, 99 S. Ct. 2450, 2458-59, 61 L. Ed. 2d 39 (1979); State v. Sensing, 843 S.W.2d 412, 417 (Tenn. 1992) (cautioning that due process clause of the Fourteenth Amendment "protects an accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"). This fundamental principle "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of the crime." Sensing, 843 S.W.2d at 417. Here, petitioner points to instances that he labels "mandatory rebuttable presumptions." Those are: (1) the demonstration using a man the height of the victim to stand next to the petitioner; (2) the testimony of the victim's daughter that her father "usually" wore a diamond ring and a six-year-old photograph showing the victim wearing a diamond ring, which was missing at the crime scene; (3) the testimony concerning seven missing Prozac pills; and (4) testimony concerning Xanax pills found with the petitioner in his mother's Florida home. We agree with the post-conviction court that there were no "mandatory rebuttable presumptions" in this case. There were no jury instructions as to either "presumptions"—a term disfavored in criminal cases, other than the "presumption" of innocence— or "permissive inferences." Furthermore, this court has already determined that the State proved every element of the crimes with which the petitioner was charged, including especially aggravated robbery. Thus, Item 7 is without merit.

Items 8 through 18 all represent tactical decisions made by counsel during the trial. We will

not second guess those decisions. We also find nothing among these allegations that rises to the level of ineffectiveness. As the post-conviction court noted, "[t]rial counsel presented the best case he could, going along with petitioner's insistence that he killed the victim while defending himself from a homosexual rage."

Item 19, regarding grand jury, was determined by the post-conviction court to be without merit. We agree that there were no grounds for challenging the grand jury proceedings. Item 20, the claim of double jeopardy, is addressed in Issue IV where we find no error to which defense counsel could object. Items 21 through 23 fall within the area of strategic and tactical trial decisions made by defense counsel, in consultation with the client where feasible. Nothing in the record indicates that counsel handled cross-examination ineffectively, particularly where he was cross-examining the daughter of the victim, given the facts of this case. Item 24, regarding the alleged failure to call certain witnesses, was addressed by the post-conviction court, which found that the testimony of these witnesses would have been irrelevant. We agree.

Item 25 was addressed by the post-conviction court, which noted that, in spite of petitioner's contention that the robbery of items from the victim and the subsequent theft of the victim's car were actually one continuous criminal event, the jury was satisfied that two separate crimes had occurred. This item implicates general double jeopardy considerations, which we address in Issue IV and conclude that no double jeopardy principles were violated. This item is without merit.

Item 26, the alleged failure to tell the jury what constituted "reasonable doubt," was not the responsibility of defense counsel but of the trial court.

As to item 27, we agree with petitioner that the trial court should have instructed the jury that testimony concerning the petitioner's prior convictions went to his credibility as a witness only. Defense counsel would have been acting appropriately to have requested such instruction. Nevertheless, such error is harmless in the context of this case where the State, as far as we are able to determine, made no mention of petitioner's former convictions during trial. We have previously shown that the trial court adequately made the jury aware of the fact that it was to consider only the evidence, not the statements of the attorneys, in determining guilt.

As to item 28, we agree with the post-conviction court that defense counsel did not perform ineffectively by failing to argue for a directed verdict of acquittal because of what the petitioner describes as "overwhelming evidence that the deceased was the true perpetrator and that the only evidence against the petitioner was proved by constitutionally defected (sic) presumption." We agree that counsel's motion was within the range of competence demanded of attorneys in criminal cases under the circumstances of this case.

As to items 29, claiming that defense counsel acted as a third prosecutor, and 30, complaining that defense counsel should not have questioned the petitioner during cross-examination regarding his prior convictions, we agree with the post-conviction court that nothing in the record indicates that defense counsel failed to perform as an effective advocate for petitioner. Once a defendant takes the stand, defense counsel typically "take the sting out" of prior convictions by

allowing the defendant to place them in the least damaging context prior to being cross-examined by the State. This was a strategic decision and not an effort by his counsel, as petitioner saw it, to discredit him.

Items 31, 32, 33, and 35 all deal with failure to raise certain issues on appeal. Our supreme court has previously held that there is no constitutional requirement for an attorney to raise every issue on appeal. See Campbell v. State, 904 S.W.2d 594, 596-97 (Tenn. 1995). These issues are without merit. As to item 34, that allegation is addressed as petitioner's Issue VII.

We have carefully reviewed each allegation of ineffective assistance of counsel in the context of attorney-client relations, investigation and preparation, control of litigation, and trial tactics, including appeal. Petitioner's assertions are either based on misapprehension of the law in Tennessee or misunderstanding of the function of counsel at trial in making strategic decisions concerning issues such as when to object, what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and what evidence should be introduced. See American Bar Association Standards relating to the Administration of Criminal Justice, Standard 4-5.2 (3d ed. 1992). Nothing in the record of this case undermines the presumption that trial counsel performed within the range of competence required of criminal attorneys. On the contrary, all the proof in the record demonstrates that trial counsel was an effective advocate. We conclude that petitioner has failed to meet the requirements of the first prong of the test of ineffective assistance of counsel, that is, that counsel's performance was not within the range of competence required of criminal attorneys.

Even if petitioner had meet this first prong, as to the second prong of the test, petitioner has failed to show that any of the alleged deficiencies of counsel were prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. See Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). The post-conviction court found the evidence of petitioner's guilt to be overwhelming. This court held on direct appeal that "under either theory of first degree premeditated and deliberate murder or of felony murder, the evidence is sufficient in this case to establish the defendant's guilt beyond a reasonable doubt of first degree murder. Additionally, the defendant's conviction of especially aggravated robbery is supported by the evidence. . . . Also, regarding the defendant's theft conviction, the state proved the necessary elements of that offense." State v. Ronald B. Waller, No. 03C01-9212-CR-00429, 1993 WL 398452, at *5-6 (Tenn. Crim. App., Knoxville, Oct. 6, 1993), perm. app. denied (Tenn. Feb. 7, 1994). Petitioner has failed to show any prejudice resulting from any claimed deficiency in counsel. At his continued hearing on his post-conviction petition, petitioner claimed to have "overwhelming evidence that this is all bogus charges," yet petitioner has failed to present the testimony of any uncalled witness, or any evidence that would have made a difference in the ultimate outcome of this case. We conclude that this issue is without merit.

### IV. Double Jeopardy

Petitioner asserts that his constitutional rights were violated when he was convicted of (1)

-33-

both premeditated murder and felony murder; and (2) both especially aggravated robbery and theft.

The double jeopardy clauses of the U.S. Constitution and the Constitution of Tennessee both state that no person shall be twice put in jeopardy for the same offense. The U.S. Supreme Court has defined the double jeopardy clause as affording a defendant three basic protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076, 23 L. Ed. 2d 656 (1969). In this case, petitioner's issue falls within the third category, protection against multiple punishments for the "same" offense. In Tennessee, determining whether two offenses are the "same" for purposes of double jeopardy requires a "close and careful analysis of the offenses involved, the statutory definitions of the crimes, the legislative intent and the particular facts and circumstances." State v. Black, 524 S.W.2d 913, 919 (Tenn. 1975). In Black, our supreme court applied the Blockburger test[13] and found that armed robbery and assault with intent to commit murder in the second degree were not identical offenses. See id. at 920. This test still provides us with an initial means for determining whether two offenses are the same for purposes of double jeopardy. Our supreme court has elaborated on Blockburger and other case law to articulate the correct analysis for determining a double jeopardy punishment issue:

> (1) a Blockburger analysis of the statutory offenses; (2) an analysis, guided by the principles of Duchac, of the evidence used to prove the offenses; (3) a consideration of whether there were multiple victims or discrete acts; and (4) a comparison of the purposes of the respective statutes. None of these steps is determinative; rather the results of each must be weighed and considered in relation to each other.

State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996).

Petitioner alleges first that he was unconstitutionally convicted of both premeditated murder and felony murder. He further alleges that nothing in the record indicates that the punishments were merged and that even if the punishments were merged, such merger, announced by this court in State v. Zirkle, 910 S.W.2d 874 (Tenn. Crim. App.), perm. app. denied (Tenn. 1995), violates the Supremacy Clause of the U.S. Constitution.

In State v. Hurley, 876 S.W.2d 57 (Tenn. 1993), the trial judge had imposed a sentence of twelve years for armed robbery and two death sentences, one for premeditated murder and one for felony murder. Our supreme court determined that both premeditated murder and felony murder

---

[13]"Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not." Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed. 306 (1932).

constitute first degree murder; the crimes are alternate means by which the offense of first degree murder can be committed. See id. at 70. Where there is only one first degree murder, there can be only one punishment. See id. However, the Hurley court cured the problem of double jeopardy punishment by vacating the conviction for felony murder. See id.

Hurley was cited by this court in Zirkle, where the defendant was convicted of premeditated murder, felony murder, and especially aggravated robbery. The trial court merged the two murder convictions into a single conviction for first degree murder and modified the sentence to a single life term to be served consecutively to the especially aggravated robbery sentence. Our supreme court concluded that the defendant was not subjected to double jeopardy. See id. at 889.

As in Zirkle, the jury in this case returned separate guilty verdicts for both premeditated murder and felony murder, indicating its determination that the proof supported a conviction for either offense. Petitioner asserts that the trial court in his case failed to merge the crimes. We disagree. The trial court instructed the jury as to Indictment No. 186378 for first degree murder in the following way:

> When you consider your verdict as to indictment number 186378, in which the defendant is charged with murder, you will first determine whether you find the defendant guilty beyond a reasonable doubt of the offense of murder in the first degree as that offense has been defined herein.
> a) You will separately consider the charge of murder in the first degree in Count I, that is, the charge that the defendant unlawfully, intentionally, deliberately, and with premeditation murdered the alleged victim. You will state as a part of your verdict whether you find the defendant guilty under Count I.
> b) You will separately consider the charge of murder in the first degree in Count II, that is, the charge that the killing of the alleged victim was unlawfully and recklessly committed during the perpetration of, or attempt to perpetrate, a robbery and theft. You will state as a part of your verdict, whether you find the defendant guilty under Count II.
> The jury may find the defendant guilty under both Count I and Count II, or under either one of the counts, or may find the defendant not guilty under both counts.
> If you find the defendant guilty of murder in the first degree, under either count of the indictment, you will then fix the punishment at life imprisonment and report that as a part of your verdict.

Later, in polling the jury, the trial court stated: "All right, members of the jury, you heard that announcement. Is it your verdict also that the defendant be sentenced to life imprisonment as a result of the verdict of murder in the first degree?" In pronouncing sentence, the trial court stated:

-35-

> Ronald B. Waller, on the verdict of the jury finding you guilty of murder in the first degree under Count I and Count II of the indictment, that is, premeditated murder and killing in the perpetration of a crime, robbery, and fixing punishment at life imprisonment, it's the judgment of the Court that you are guilty of that offense and you are sentenced to life imprisonment for murder in the first degree.

The record is clear on this issue. The petitioner was never subjected to double jeopardy multiple punishments as a result of being found guilty of both premeditated and felony murder. He was convicted of first degree murder and sentenced to life in prison.

Petitioner relies on two Sixth Circuit cases, Pryor v. Rose, 724 F.2d 525 (6th Cir. 1984), and Blake v. Morford, 563 F.2d 248 (6th Cir. 1977), for the proposition that the United States Court of Appeals for the Sixth Circuit has held that convictions for both felony murder and premeditated murder are violative of the Double Jeopardy Clause. Neither case stands for such a holding.[14]

Secondly, petitioner asserts that he was subjected to double jeopardy when he was convicted of and received punishment for both especially aggravated robbery and theft. This court has previously affirmed both convictions. We find nothing in the test outlined by our supreme court in State v. Denton to persuade us now that petitioner is being unconstitutionally punished for the same criminal transaction. Petitioner's double jeopardy issues are without merit.

---

[14]Blake dealt with a Tennessee murder indictment stated in common law form and upheld appellant's conviction. See Blake, 563 F.2d at 252. Pryor dealt with an earlier version of Tennessee's first degree murder statute, Tennessee Code Annotated § 39-2402 and held that where there was a variance between the indictment and the jury instructions, the appellant was subjected to double jeopardy. See Pryor, 724 F.2d at 531. Neither case supports petitioner's arguments here, and petitioner's assertion that these cases have established federal law which prohibits merger of convictions for premeditated murder and felony murder into one conviction for first degree murder under Tennessee Code Annotated § 39-13-202 is without legal basis.

## V. Evidentiary Rulings

Petitioner alleges errors of evidentiary rulings on the part of the trial court. Specifically petitioner argues that his constitutional rights were violated when the trial court: (1) failed to exclude autopsy photographs of the victim, as well as other photographs, on the grounds of unfair prejudice; (2) improperly admitted evidence of petitioner's letter to Carlena Thompson written two days after the murder; and (3) permitted expert testimony concerning the redness of the petitioner's knuckles as shown in a photograph taken nine days after the murder. The post-conviction court determined that the trial court correctly ruled that the probative value of the autopsy photographs and other photographs substantially outweighed prejudicial effect; that the entire letter to Carlena Thompson was highly relevant; and that Dr. King's testimony concerning his opinion that the injuries to the petitioner's knuckles appeared to be consistent with an offensive action was appropriate. We agree with the post-conviction court. The State had to prove intent, premeditation and deliberation to warrant a conviction for first degree murder under Count I of the indictment, for which this evidence was relevant. This issue is without merit.

## VI. Prosecutorial Misconduct

Petitioner claims fifteen instances, many with sub-issues, of prosecutorial misconduct in his original petition for post-conviction relief. These instances are as follows:

1. Impermissible amendment to the indictment implicating principles of double jeopardy;
2. Pyramiding of offenses;
3. Subornation of perjury in testimony of Floyd Fuller;
4. Improper shifting of burden though use of mandatory rebuttable presumptions;
5. Improper participation in demonstrations resulting in denial of confrontation rights;
6. Intentional and prejudicial references to malice;
7. Prejudicial opening statement;
8. Improper attack on petitioner's character;
9. Improper statement that added to prosecutor's official position ("I was in the Army");
10. Brandishing handgun;
11. Improper cross-examination;
12. Improper comments and questions;
13. Intentional delay;
14. Prejudicial closing argument; and
15. Misconduct amounting to cumulative error.

We have already addressed item 1 and item 4, concluding no error occurred; therefore, no prosecutorial misconduct occurred. As to item 2, any allegation of pyramiding of offenses is moot. This court has already affirmed all convictions. As to item 3, petitioner alleges that the testimony

of Floyd Fuller was fabricated. Fuller testified as to what he saw from his window, that is, a taller man tugging and pulling a shorter man back towards the building. We agree with the post-conviction court that there is no evidence of any perjury on the part of Floyd Fuller.

Item 5 involves the prosecutor's participation in two re-enactment demonstrations. One involved the petitioner's showing how he opened his knife with one hand and the other showing how petitioner pushed the victim away. We have already determined that to request a re-enactment of the struggle between the victim and the petitioner was proper cross-examination. The demonstration with the knife was also proper cross-examination. The fact that the prosecutor commented that he also found opening the knife with one hand difficult did not rise to the level of his becoming a witness for the State. The petitioner was not denied confrontation rights.

As to items 6 through 12, and item 14, we agree with the post-conviction court that no error of any consequence occurred.

Petitioner asserts in item 13, that by filing Intent to Seek Death Penalty and failure to comply with discovery were intentional delays for the purpose of prejudicing the petitioner. We agree with the post-conviction court that no prejudicial delay occurred in this case. This issue was also addressed as one of petitioner's allegations of ineffective assistance of counsel. Defense counsel testified that the case proceeded to trial as soon as it was ready to be tried.

Having found no instances of prosecutorial misconduct we conclude that petitioner's final item citing cumulative error is without merit.

## VII. Cumulative Errors

We have carefully examined each of petitioner's many allegations of error, which he now asserts denied him of his constitutional right to a fair trial. Having found no prejudicial error, we conclude that this issue fails.

## VIII. Fundamental Miscarriage of Justice

A miscarriage of justice in the context of reversible, constitutional error means a reasonable probability of a more favorable outcome for the accused. See People v. Lopez, 251 Cal. App. 2d 918 (Ct. App. 1967). A miscarriage of justice such as to warrant reversal should be declared only when the court, having examined the entire record, is of the opinion that it is reasonably probable that a result more favorable to the defendant would have been reached were it not for the errors. See People v. Bernhardt, 222 Cal. App. 2d 567 (Ct. App. 1963). The U.S. Supreme Court has characterized petitioner's last issue as a "narrow miscarriage of justice exception" and one that is demonstrated when the accused can show that the violations "caused the conviction of an innocent person." McCleskey v. Zant, 499 U.S. 467, 469, 111 S. Ct. 1454, 1457, 113 L. Ed. 2d 517 (1991). We have concluded that no constitutional errors occurred in this case to invoke the "miscarriage of justice" exception.

## CONCLUSION

Based on our exhaustive review, the judgment of the post-conviction court dismissing petitioner's post-conviction relief petition is hereby affirmed.